### In re LONG ISLAND R. CO.
### Bankr. 47970.

United States District Court
E. D. New York.

Oct. 25, 1951.

See also 92 F.Supp. 85, 95 F.Supp. 919.

Shearman & Sterling & Wright, New York City (Boykin C. Wright, William W. Golub, and Thomas A. Ennis, all of New York City, of counsel), for Trustee.

Edward W. Bourne, New York City, for Long Island Transit Authority.

Conboy, Hewitt, O'Brien & Boardman, New York City (John Vance Hewitt, and Bernard Sobol, New York City, of counsel), for the Pennsylvania R. and American Contract and Trust Co.

G. Burchard Smith, County Atty., of Nassau County, Mineola, N. Y., Orrin G. Judd, Special Counsel, New York City.

Harold L. Warner, New York City (Edward L. Cox, Jr., Asst. Counsel, Brooklyn, N. Y., of counsel), for The Board of Transportation of the City of New York.

Dennis M. Hurley, Corp. Counsel of the City of New York, Brooklyn, N. Y., and James J. Thornton, Asst. Corp. Counsel, New York City, for City of New York.

Nathaniel L. Goldstein, Atty. Gen. (Abe Wagman, Asst. Atty. Gen., of counsel), for the State.

Milbank, Tweed, Hope & Hadley, New York City (Orville W. Wood, New York City, of counsel), for Chase National Bank of the City of New York as Trustee under the Refunding Mortgage.

Cravath, Swaine & Moore, New York City (R. O. Hancox, New York City, of counsel), for the Chemical Bank & Trust Co.

Lawrence E. Walsh, New York City (Philip Hodes, Asst. Counsel, New York City, of counsel), for Public Service Commission.

O'Donnell & Schwartz, New York City (John F. O'Donnell, New York City, of counsel), for Transport Workers Union of America, CIO.

C. W. Wysong, General Chairman, Brotherhood of Railway and Steamship Clerks.

Edward F. Higley, Jr., representing R. Labor Executive Assn.

Bernard L. Alderman, New York City, representing Brotherhood of R. Trainmen.

James O'Connell, New York City, representing Brotherhood of Locomotive Engineers.

M. A. Porch, Vice President Brotherhood of Locomotive Firemen and Engineers.

T. L. Carman, New York City, H. C. Maier, Gen. Chairman of Brotherhood of Locomotive Firemen and Engineers.

F. H. Meyers, Gen. Chairman of Brotherhood of Railroad Firemen.

A. E. MacDougall, representing Queens Chamber of Commerce and Long Island Real Estate Board.

William F. Brunner, former President of the Chamber of Commerce of the Rockaways.

George Wolpert, Executive Secretary of the Chamber of Commerce of the Rockaways.

KENNEDY, District Judge.

This is an application brought on by petition dated October 18, 1951, for an order authorizing the trustee to accept an offer made by the Board of Transportation of the City of New York with the unanimous approval of the Board of Estimate of the City of New York (in what is said hereafter I shall usually refer to these two agencies as the "city"). Under the offer the city agrees to pay to the trustee of the Long Island Rail Road the sum of $8,500,000. for the Rockaway lines of the road. The property which is the subject of the purchase is the line extending from White Pot Junction in a southerly direction to Hamilton Beach and continuing across Jamaica Bay, where a trestle formerly stood, to the Rockaway peninsula, and the

line with which it connects running east and west from Rockaway Park to Far Rockaway. The property thus forms an inverted "T". The segment which the city offers to purchase (including a four-mile portion of the trestle) extends over a length of 15.47 miles, is equipped with 35.96 miles of track and signal devices, and serves 19 stations, 12 of them almost new.

On May 8, 1950, a portion of the trestle already mentioned, which carried approximately 1,800 feet of double track, was destroyed by fire, the destroyed section extending in a southerly direction from a point about 1,300 feet south of Hamilton Beach station. By appropriate proceedings the then trustee secured an order dated July 11, 1950 permitting them to apply to the Interstate Commerce Commission for a certificate of public convenience and necessity under the Interstate Commerce Act, 49 U.S.C.A. § 1, pars. 18–20, which would allow the abandonment of the trestle and immediately connecting portions of the Rockaway Beach and Far Rockaway branches. One more fact of history should be mentioned: in December 1933 an agreement was made between the Board of Transportation and the railroad for the purchase of the same property, the price being $10,300,000. plus the grade-crossing liability of the railroad to the state, then estimated at some $4,500,000. This agreement was never consummated. There was a change in the city administration shortly after the agreement was formulated.

I caused notice of hearing on the petition to be served upon all of the parties in interest in the estate. Notice was also given to Mr. Michael Quill, president of the Transport Workers Union of America, and Mr. John F. O'Donnell, counsel to the same union, both of whom had publicly criticized the proposed transaction. Notice of hearing was also published. There were present in the courtroom attorneys representing the tax, bond and other creditors, the State of New York, the New York Public Service Commission, and the various operating and non-operating brotherhoods. Mr. Quill did not appear but the attorney for his union did.

It seems to me that my function is to determine (1) whether the offer is adequate, and (2) whether it is in the interest of the public as a whole, and specifically the people who need and use transportation to and from the Rockaway peninsula.

The assessed value of the property for the current year, eliminating anything but a small amount for the destroyed trestle, is about $11,720,000. The reproduction cost, less depreciation of the same portion of the road, again eliminating the burned-out trestle, is about $11,660,000. The best estimate of the grade-crossing liability of the railroad to the state (which has not yet been entirely determined and is to be assumed by the city or reimbursed by the city to the railroad) is $1,500,000. On the basis of these figures, the property should be worth slightly under $10,000,000. even after the discharge of the grade-crossing liability. And, as said, the offer of the city is $8,500,000. In addition, during the time that the city is completing its reconstruction before it takes over operation of the lines, the railroad is to operate under a lease calling for a rental of an amount equal to the current taxes, which will probably aggregate about $385,000. annually. Should the construction and take-over by the city require more than three years, the lease-rental thereafter will be determined by agreement of the parties or arbitration. Another feature of the contract deserving mention will provide that the Board of Transportation and the Trustee will both be under an obligation to protect the positions and the seniority rights of any Long Island Rail Road employees whose services might otherwise not be required by this railroad as a result of its discontinuance of the Rockaway operation.

On the narrow basis of dollars and cents to be received, the price offered by the city might be susceptible of criticism as being too low. And it might be persuasively argued that by expensive and protracted condemnation or other procedures a higher price might be secured. But, as pointed out by the trustee in his testimony, the estate will realize important incidental advantages. When the transaction is carried out, it will be possible to retire from service a considerable amount of equipment which is antiquated and expensive to maintain. Better and safer service will be pos-

sible because a number of trains now going through the bottleneck at Jamaica can be eliminated. The possible liability on the estate to rebuild the trestle at a minimum cost of between $1,000,000. and $2,000,000. will be avoided. In addition, the availability of immediate cash is of great importance to the trustee. It will enable him to finance his safety program without borrowing any funds, as he had contemplated, and also will permit him to proceed at once with the balance of his capital improvement program. And one of the most important features of the plan of purchase lies in the fact that the population, both permanent and transient, of the Rockaways will be given more direct and probably cheaper transportation after the city has taken over.

Valuation at best is nothing but an informed guess, as the Supreme Court of the United States has indicated many times in connection with, for example, condemnations of real estate and railroad reorganizations. Consolidated Rock Products Co. v. Du Bois, 1941, 312 U.S. 510, 526, 61 S.Ct. 675, 85 L.Ed. 982. The problem is particularly complex in the case of a public utility. On all the evidence, and my experience in this proceeding, I can reach no other factual conclusion except that the acceptance of the city's offer is an economic benefit to the estate and extremely desirable in the public interest.

At the hearing the principal creditor, the Pennsylvania Railroad Company, suggested that while it did not oppose the acceptance of the offer, it thought desirable the clarification of some points in connection with the temporary lease of the property by the trustee. I, myself, feel sure that these points are no longer capable of negotiation. But, in compliance with the request of the Pennsylvania, I have asked counsel for the trustee to call them to the attention of the city authorities at the time of the preparation of the formal contract.

The operating and non-operating brotherhoods had no quarrel with the merits of the purchase but naturally were highly interested in the protection of the tenure, status and seniority of any employees who might be affected. The number of these was estimated at between 150 and 200. This point had previously been discussed between counsel for the trustee and counsel for the Board of Transportation, and while it is impossible at this time to draw a definitive agreement outlining specifically the rights of each employee, there was and is a clear understanding that the contract will embody a paragraph expressing the joint intention and purpose to protect these employees. And, concerning the form of this paragraph, counsel for the trustee has been directed to consult with the attorneys for the various brotherhoods involved.

The State of New York voiced some concern about the preservation of its claimed lien for grade-crossing obligations upon the proceeds of the purchase. However, the trustee has indicated that he expects to use cash realized from this transaction to meet the cost of his program for the rehabilitation of the road. One large item in this program is the purchase of safety devices which heretofore the trustee had intended to finance through a loan made by various banks. I held that such loans had priorities even over taxes and grade-crossing obligations, 95 F.Supp. 919, but even if I was wrong, Congress recently passed and the President yesterday signed an act which validates my action (H.R. 4693, 82nd Con., 1st Sess.). If cash arising from this sale is used in lieu of borrowing, it must be manifest that tax and grade-crossing claims will have their priorities restored, and that as to these items no questions ought arise concerning preservation of liens. As for the balance of the cash secured, the trustee has expressed his intention of using that to finance his rehabilitation program and other administrative expenses which would have a priority in any event. Nevertheless, the contract, as I understand it, is not to disturb whatever status or seniority tax claims had before the consummation of the transaction.

One more point remains to be considered. I have previously mentioned that officials of the Transport Workers Union of America, through various public media and specifically in the Board of Estimate, had criticized this transaction on the ground that the city was paying too much and also on the ground that the rights of employees were not protected at the time of and after

the change-over. It became clear to me after hearing the attorney for the union that his remarks were based upon the mistaken idea that, as part of the consideration for the purchase of the property, the city was forgiving some $9,000,000. of taxes owed by the railroad. This. is not so and never was so. Moreover there was a misapprehension, apparently, that the property which is the subject of the purchase was not being operated as a railroad. That is not a fact. Even since a portion of the trestle was burned, the railroad has been in full operation down to Hamilton· Beach, and the entire Rockaway peninsula has been served by a roundabout route through Valley Stream. In other words, the Rockaway portion of the railroad as well as the mainland portion down to Hamilton Beach have been in constant operation. As for the protection of employees who might possibly be affected when the Board of Transportation takes over, I can only say that assurances were given not only by the trustee but also by the Board of Transportation and the Corporation Counsel of the City of New York to the effect that the intention is fully to protect these men, that a clause to this effect will be inserted in the contract, that the brotherhoods will be consulted in connection with the preparation of the clause, and will also be given notice of the Interstate Commerce Commission hearings on the point; and that these assurances fully satisfied the brotherhood representatives of the employees concerned.

The trustee is authorized to accept the offer, the acceptance to be in the form attached to the petition.

Settle order on notice.