## UNITED STATES *v.* TEXAS ET AL.

No. 44. Argued November 19, 21, 1941.—Decided December 22, 1941.

*Mr. Arnold Raum,* with whom *Assistant Solicitor General Fahy, Assistant Attorney General Clark,* and *Messrs. Sewall Key, J. Louis Monarch,* and *Clarence E. Dawson* were on the brief, for the United States.

*Mr. Pat M. Neff, Jr.,* Assistant Attorney General of Texas, with whom *Messrs. Gerald C. Mann,* Attorney General, and *George W. Barcus,* Assistant Attorney General, were on the brief, for respondents.

Mr. Justice Byrnes delivered the opinion of the Court.

W. L. Nix was a manufacturer and distributor of motor fuel, doing business in Texas under the name of Texas Refinery. On November 20, 1933, M. R. Ingraham, who held a demand note secured by a chattel mortgage on certain tanks belonging to Nix, brought an action in the District Court of Gregg County, Texas. He alleged that demand had been made on the note, that it had not been paid, that Nix owned no property in Texas other than that of Texas Refinery, that the value of the mortgaged tanks was insufficient to discharge the note, that the tanks were not used "for a separate purpose" but in the "operation of the said refinery as a unit," and that Nix was insolvent. He asked that judgment be entered in his favor for the amount of the note, that the mortgage be foreclosed, and that in the meantime a receiver be placed in charge of "the whole of the property" of Texas Refinery. On the

same day a receiver was appointed, and he was subsequently authorized to sell all of the refinery property.

On November 21, R. P. Ash intervened in the proceedings as the holder of an overdue note secured by a mortgage on the physical plant of the refinery not subject to the Ingraham mortgage. Both the State of Texas and the United States then intervened with the claims for state and federal gasoline taxes, which are the subject of the present dispute. Later, both the Ingraham and Ash mortgage notes were assigned to Howard Dailey.

The District Court found that Nix was insolvent on November 20, 1933, and continued to be insolvent thereafter. The sum available for distribution after sale of the refinery property by the receiver was $7466.92. The court found that, of these proceeds, $1294.80 was allocable to those assets which were subject to the mortgages held by Dailey, and it ordered that his claim to that amount be first satisfied. It determined that Nix was liable to the United States for $19,343.91 in federal gasoline taxes, and to Texas for $40,312.51 in state gasoline taxes. As between the state and federal claims, it decided that the United States was entitled to priority, and concluded that nothing would be left to apply to the Texas claim.

From this order Texas appealed to the Court of Civil Appeals for the Second District. That court certified the controlling questions to the Supreme Court of Texas. The Supreme Court, on the authority of *State* v. *Wynne*, 134 Tex. 455, 133 S. W. 2d 951, a companion case decided the same day, answered the questions in such a way as to require that the claim of Texas be first satisfied, that of Dailey second, and that of the United States third. The Court of Civil Appeals thereupon so ruled, noting that the assets available would not completely satisfy even the claim of Texas and that Dailey and the United States would receive nothing. A motion by the United States for a rehearing was denied, and the Supreme Court of

Texas refused to review the decision of the Court of Civil Appeals. We granted the petition of the United States for certiorari because of the important question of the fiscal relationship between state and federal governments which is involved.

No question as to the rights of Dailey, the mortgagee, is raised by this appeal. We confine ourselves, therefore, to the only question presently open to decision: the relative priority of the claims of the United States and Texas.

The United States rests its assertion of priority upon § 3466 of the Revised Statutes.[1] Despite the contention of Texas to the contrary, that section clearly applies to this proceeding. As we recently remarked in *United States* v. *Emory*,[2] § 3466 covers in terms the case of an insolvent debtor who has committed an act of bankruptcy, and there are few more familiar examples of an act of bankruptcy than the appointment of a receiver because of the debtor's insolvency. *Cf.* § 3 (a) (4) of the Bankruptcy Act, U. S. C., Title 11, § 21 (a) (4). Here the district court expressly found that Nix was insolvent, and it appointed a receiver. It is true that the original petition was filed by a mortgagee rather than by a general creditor. But, if any limitations upon the operation of § 3466 might otherwise have flowed from this circumstance, they were removed by the subsequent character of the proceeding.

---

[1] U. S. Rev. Stat. § 3466 (U. S. C., Title 31, § 191) provides: "Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied; and the priority established shall extend as well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed."

[2] *Ante,* p. 423.

The receiver was placed in control of all of Nix's assets, rather than only those subject to the mortgage, and all of the assets were eventually liquidated. Parties other than the mortgagee, including Texas itself, intervened and were heard. We think that realities require us to treat the proceeding as a general equity receivership within the scope of § 3466.

We are thus brought to the important issue in the case. Article 7065a–7 of the Texas Civil Statutes declared that all gasoline taxes due by any distributor to the State "shall be a preferred lien, first and prior to any and all other existing liens, upon all of the property of any distributor, devoted to or used in his business as a distributor . . . ." [3] It is the State's position that under this section it held a specific and perfected lien upon the refinery property which entitled it to priority despite § 3466 of the Revised Statutes.

Section 3466 mentions no exception to its requirement that "the debts due to the United States shall be first satisfied." It is nevertheless true that in several early decisions this Court read an exception into the section in the case of previously executed mortgages. *Thelusson* v. *Smith*, 2 Wheat. 396, 426; *Conard* v. *Atlantic Insurance Co.*, 1 Pet. 386; *Brent* v. *Bank of Washington*, 10 Pet. 596, 611, 612. This doctrine seems to have been based on the

---

[3] The full text of the paragraph, as of Nov. 20, 1933, when the receiver was appointed read: "All taxes, fines, penalties and interest due by any distributor to the State shall be a preferred lien, first and prior to any and all other existing liens, upon all of the property of any distributor, devoted to or used in his business as a distributor, which property shall include refinery, blending plants, storage tanks, warehouses, office buildings and equipment, tank trucks or other motor vehicles, or any other property devoted to such use, and each tract of land on which such refinery, blending plant, tanks or other property is located, or which is used in carrying on such business." This section was repealed on May 1, 1941 by Article XVII, § 28 of the Acts of the 47th Legislature, and simultaneously replaced without significant change by a new Article 7065b–8.

theory that mortgaged property passes to the mortgagee and is no longer a part of the estate of the mortgagor. See *Conard* v. *Atlantic Insurance Co., supra,* at 441–442. The question of whether the priority of the United States under § 3466 would also be defeated by a specific and perfected lien upon property, whose title remained in the debtor was reserved in those cases. *Ibid.; Brent* v. *Bank of Washington, supra,* at 611–612. However, it was determined that a general judgment lien upon the lands of an insolvent debtor does not take precedence over claims of the United States unless execution of the judgment has proceeded far enough to take the land out of the possession of the debtor. *Thelusson* v. *Smith, supra,* at 425–426.

In more recent years the Court has had occasion to consider the argument that liens created in favor of States or counties by state statutes entitled them to priority over the United States under § 3466. In *Spokane County* v. *United States,* 279 U. S. 80, the priority of the United States was upheld. The state statutes involved provided that if a certain personal property tax was not paid, and if the personal property against which it had been assessed was no longer in the hands of the delinquent taxpayer, the amount of the unpaid tax should become a lien upon all the real and personal property of the taxpayer. They went on to prescribe the procedure by which the lien was to be enforced. The Court determined that the statutory lien did not become specific until this procedure had been followed. Since these procedural conditions had not been satisfied in the case before it, the Court refused priority to the tax claims of the county. It specifically declined to consider what "the effect of more completed procedure in the perfecting of the liens under the law of the State" would have been. 279 U. S. at 95.

The New York statute in *New York* v. *Maclay,* 288 U. S. 290, declared that the corporate franchise tax there involved should "be a lien and binding upon the real

and personal property of the corporation . . . until the same is paid in full." 288 U. S. at 292. Although the franchise taxes in question were overdue, the State had taken no steps to perfect and liquidate its lien at the time the receiver was appointed for the insolvent corporation. Under such circumstances, the Court was of the opinion that the tax claim of the State did not deprive the claim of the United States of its priority under § 3466. It was at pains to make clear, however, that it intended by its decision to lend no support to the assumption that the doctrine of the mortgage cases, whatever its current vitality, would require the subordination of unsecured claims of the United States to a specific and perfected lien. 288 U. S. at 293–294.[4]

We think that it is equally unnecessary to test that assumption here. Prior to the appointment of the receiver on November 20, 1933, the State of Texas had made no move to assert the lien proclaimed in Article 7065a–7. And the priority which attached to the claim of the United States on that day (*United States* v. *Oklahoma*, 261 U. S. 253, 260) could not be divested by any subsequent proceedings in connection with the State's lien. *New York* v. *Maclay, supra,* at 293.

It is urged, however, that Article 7065a–7 by its own force creates a specific and perfected lien. Support for this contention is said to lie in the fact that the statutory lien purports to affect only the property of the

---

[4] In *United States* v. *Oklahoma,* 261 U. S. 253, the question was not reached because it was found that the "insolvency" upon which the operation of § 3466 is conditioned was absent. The Court sustained the priority of the United States under § 3466 in *United States* v. *Knott,* 298 U. S. 544. The Florida statutes there involved required foreign surety corporations to deposit certain bonds with the State Treasurer for the protection of Florida residents. This arrangement was held to create no more than "an inchoate general lien" for the benefit of unknown persons who might become entitled to the fund, and not to limit the effect of § 3466.

distributor which is "devoted to or used in his business as a distributor," rather than his property in general. This is thought to make the lien sufficiently specific. Moreover, the State argues, and the Supreme Court of Texas has declared,[5] that the provisions of the Texas Civil Statutes which govern the levy, seizure and sale of the property of delinquent taxpayers generally[6] are inapplicable to the gasoline tax. We are of course bound by this authoritative construction of the statute.

With respect to this contention it may first be said that the "property devoted to or used in his business as a distributor" is neither specific nor constant. But a more important consideration is that the amount of the claim secured by the lien is unliquidated and uncertain. As we said in *New York* v. *Maclay*: "If the state were to . . . omit to ascertain the debt, it would never be able to sell anything, for it would not know how much to sell." 288 U. S. at 293. That the legislature of Texas recognized this is revealed by another section of the statute. Article 7065a–8 (d) declared that, in the event of default, when it might become necessary for the State "to bring suit or to intervene . . . for the establishment or collection" of its claims in judicial proceedings, the tax reports required of the distributor by other provisions of the statute[7] should be "prima facie evidence of the contents thereof," but "the incorrectness of said report or audit may be shown." Thus, it was clearly envisaged that the amount of the taxes due, for which the lien was security, should be left to determination by the courts.

As to the nature of the proper procedure for levy, seizure, and sale, it is enough to say that some procedure is essential. As we have indicated, the statutory scheme reveals that the legislature contemplated resort to the

[5] *State* v. *Wynne*, 134 Tex. 455, at 473.
[6] See, esp., Articles 7266, 7272, and 7275 of the Texas Civil Statutes.
[7] Article 7065a, §§ 2 (b), 2 (d), 8 (a), and 8 (b).

courts. In addition to the statutory provisions referred to above, Article 7065a–8 (e) regulates the pleadings in suits by the Attorney General to collect the tax, and Article 7065a–9 determines the venue of such suits. Consequently, while it was clearly intended by Article 7065a–7 to create a lien in favor of the State, we must conclude that of necessity it was nothing more than an inchoate and general lien. Certainly it did not of its own force divest the taxpayer of either title or possession. It could not become specific until the exact amount of the taxes due had been determined, and it could not be enforced without the assistance of the courts. Like the tax lien in *New York* v. *Maclay, supra,* it served "merely as a *caveat* of a more perfect lien to come." 288 U. S. at 294.

We are not now called upon to decide whether the chattel mortgages held by Dailey are entitled to priority over the claim of the United States.[8] We hold only that the tax claim of the United States is entitled to priority over the tax claim of Texas. The case is remanded to the Court of Civil Appeals for proceedings not inconsistent with this opinion.

*Reversed.*

Mr. Justice Jackson took no part in the consideration or decision of this case.

---

[8] The texts of the mortgages are not contained in the record: and Dailey did not appear in this Court.