**In re LONG ISLAND R. CO.**

**No. 47970.**

United States District Court,
E. D. New York.

Feb. 3, 1951.

Shearman & Sterling & Wright, New York City, for trustee, Boykin C. Wright, William W. Golub, and Joseph A. Doyle, New York City, of counsel.

Richard R. Bongartz, General Atty., New York City, for trustee.

Conboy, Hewitt, O'Brien & Boardman, New York City, for Pennsylvania R. Co., and American Contract & Trust Co., Bernard Sobol, New York City, of counsel.

Cravath, Swaine & Moore, New York City, for Chemical Bank & Trust Co., Robert O. Hancox, New York City, of counsel.

Milbank, Tweed, Hope & Hadley, New York City, for Chase Nat. Bank of City of New York, Orville W. Wood, New York City, of counsel.

G. Burchard Smith, County Atty. of Nassau County, Mineola, N. Y., and Fred J. Munder, County Atty. of Suffolk County, Huntington, N. Y., Orrin G. Judd, New York City, of counsel, for Nassau and Suffolk Counties.

John P. McGrath, Corp. Counsel of the City of New York, New York City, James J. Thornton and G. Gary Sousa, New York City, of counsel, for New York City.

Nathaniel L. Goldstein, Atty. Gen. of the State of New York, Abe Wagman, New York City, of counsel, for the State.

Edward S. Greenbaum, Gen. Counsel, New York City, for the Long Island Rail Road Commission.

KENNEDY, District Judge.

On February 17, 1950, there occurred on the debtor's line a wreck near the station at Rockville Centre which resulted in the loss of 17 lives and numerous passenger injuries. Extremely large financial loss was incurred by the debtor in the discharge of the various claims arising from that incident.

On November 22, 1950, there occurred a second serious wreck at or near Kew Gardens, L. I. This wreck resulted in the loss of 79 lives and again there were numerous passengers seriously injured.

On December 18, 1950, the Interstate Commerce Commission, which by statute is charged with the duty to supervise carrier operations, equipment and safety de-

vices, 49 U.S.C.A. § 26, after hearings, made certain recommendations to the trustee (Ex Parte No. 176, Accident Near Jamaica, N. Y., so far unreported). The recommendation can be set forth substantially as follows: "It is recommended that the trustees of the Long Island Railroad Company extend the automatic cab-signal system to its line between Harold and Hillside, and install a train-control system on that part of the line above referred to and also on that part of its line now equipped with an automatic cab-signal system which train-control system will automatically and continuously enforce a speed restriction of not exceeding 12 miles per hour for trains when entering and while proceeding through a block occupied by a preceding or opposing train. Unless the Commission is advised within 30 days after this report is served that these recommendations will be complied with, consideration will be given to the institution of a further proceeding under Section 25 of the Interstate Commerce Act".

In the meantime, the Governor of the State of New York had on November 26, 1950, announced the appointment of a Commission to deal with the problems presented by the future operation and maintenance of the Long Island Rail Road. That Commission advised the trustee that the recommendations made by the Interstate Commerce Commission should be carried immediately into effect and that, in addition, automatic train-stop protection should be supplied on the Atlantic Branch between Brooklyn and Jamaica and wayside equipment (speed control) on the main line of the road from Hall to Mineola, on the Hempstead Branch from Floral Park to Hempstead, and on the Atlantic Branch from Jamaica to Valley Stream.

On January 4, 1951, the Public Service Commission of the State of New York issued a report on its investigation of the Kew Gardens wreck (P.S.C. Case 15157). In this report, the Public Service Commission stated that the recommendations of the Interstate Commerce Commission were satisfactory as a first step, but indicated that additional steps were desirable.

The trustee thereupon invited representatives of the Public Service Commission of the State of New York, the Interstate Commerce Commission, and the Long Island Rail Road Commission to advise the court concerning the safety device plan which he (the trustee) had prepared.

A hearing was held on January 11, 1951, in the course of which all of the experts for the Commissions mentioned, as well as the experts in the employ of the railroad itself, concurred in the view that the trustee's plan was not only necessary but also the best possible, and that it was in no way deficient or otherwise subject to criticism. At the same hearing it developed that the cost of proceeding with the plan would be approximately $6,000,000, and expert evidence was brought forward to show that this cost was fair and reasonable.

The trustee thereupon consulted various financial institutions and reached the conclusion that the financing needed to put the safety device program into effect at a cost of $6,000,000 could be secured. In a petition by the trustee dated January 23, 1951, the terms and conditions on which such a loan could be made against trustee certificates, as set forth in a letter from a group of banks dated January 19, 1951 were presented to the court.

A second hearing was held on January 26, 1951, on notice to all of the parties to the record, including mortgage creditors and the taxing authorities of the State of New York, of the City of New York, and of the counties of Nassau and Suffolk. At this hearing the trustee described his efforts to secure financing. Upon this evidence no conclusion could be reached except that the financing plan embodied in the letter of January 19, 1951, was and is the best procurable and that, in view of the financial condition of the debtor, financing of some kind to carry into effect the safety program was at this time absolutely necessary. At this hearing there was reserved the question of what priority the court could and should give to the banks advancing money under the terms of the proposal of January 19, 1951, which the trustee was authorized to accept.

The only open question remaining for determination was dealt with at a third hearing held on February 2, 1951, again on notice to all of the taxing authorities mentioned above as well as to all of the secured creditors. Opportunity to be heard was offered to all these parties, and all were unanimous on the point that the installation of the safety devices could not and should not be opposed. All of those appearing, except counsel for the City of New York, agreed that the court had the power to subordinate not only secured liabilities but also taxes to the lien of trustee's certificates issued to those advancing the money for the purpose of installing the safety devices. The secured creditors, representing interests under a so-called Unified Mortgage and also a Refunding Mortgage, reserved the right to notice and hearing on the question of the necessity for borrowing as trustee certificates were about to be issued. Counsel for the City of New York expressed some doubt concerning the power of the court to make trustee's certificates for safety device expense a paramount lien, but supplied no authority negating the existence of such a power.

It was agreed by all counsel that the petitions of the trustee could be treated as prayers for the declaration of rights, and counsel were further in agreement that this should be done in order that this phase of the proceedings may terminate, if possible, in an appealable order.

■ There was never any doubt in my mind that a creditor whose monies are used to make a bankrupt railroad safe, can be given and should be given an equitable lien superior to that of secured creditors, such as mortgage bondholders and the like. Southern Ry. Co. v. Carnegie Steel Co., 1900, 176 U. S. 257, 20 S.Ct. 347, 44 L.Ed. 458. It is true that that case dealt with a situation where the current assets and earnings were sufficient to pay for the equipment needed, and the contest was between the unpaid equipment creditor and bondholders who had been paid interest. However, it seems to me that where current assets are insufficient, as they are in this case, to make the railroad safe, and borrowing is necessary, then *a fortiori* a lender has a paramount equitable lien over that held by any other type of secured creditor.

■ Concerning the question of the power of a reorganization court to subordinate taxes to the equitable lien of a safety equipment creditor, there is a dearth of authority as one would naturally suppose. However, it has been said Gardner v. State of New Jersey, 1947, 329 U.S. 565, 576, 67 S.Ct. 467, 473, 91 L.Ed. 504, that Section 77, sub. b of the Bankruptcy Act, 11 U.S.C.A. § 205, sub. b "gives the reorganization court broad powers over all types of liens". Furthermore, the court said 329 U.S. at page 577, 67 S.Ct. at page 473, "If the reorganization court lacked the power to deal with tax liens of a State, the assertion by a State of a lien would pull out chunks of an estate from the reorganization court and transfer a part of the struggle over the corpus into tax bureaus and other state tribunals. That would not only seriously impair the power of the court to administer the estate and adversely affect the power of the Interstate Commerce Commission and the court to promulgate a reorganization plan." (sic, citing cases).

Mr. Justice Douglas, speaking for a unanimous court in the Gardner case, just cited, uses language that might have been composed to meet and solve the problem at bar 329 U.S. at page 579–580, 67 S.Ct. at page 474: "The validity and priority of one lien, whether or not claimed by a State, as against other liens, are questions for the reorganization court. Illustrating but not limiting the range of that inquiry are questions whether local law creates the lien asserted; whether it was sufficiently perfected prior to the petition for reorganization as to be good against other liens, cf. New York v. Maclay, supra, [288 U.S. 290, 53 S.Ct. 323, 77 L.Ed. 754]; United States v. Texas, supra, [314 U.S. 480, 62 S.Ct. 350, 86 L.Ed. 356]; whether, if it were inchoate at that time, it could be perfected subsequent to the petition, Lyford v. State of New York, 2 Cir., 140 F.2d 840; and whether the lien, though paramount, is subordinate to administration expenses or other claims under either the general bankruptcy rule, City of New

York v. Hall, 2 Cir., 139 F.2d 935, or the equity rule, 5 Collier on Bankruptcy (14th Ed.) par. 77.21. See Warren v. Palmer, 310 U.S. 132, 60 S.Ct 865, 84 L.Ed. 1118."[1]

And at least one case at district (Randolph v. Scranton M. & B. R. Co., D.C.M.D. Pa. 1935, 10 F.Supp. 699, 700, affirmed, Commonwealth of Pennsylvania v. Acker, 3 Cir., 1936, 84 F.2d 443) specifically holds that receivers' compensation. "and other expenses incurred by the receivers" can be given priority in distribution after sale over taxes assessed by the Commonwealth.

There is no essential dispute of fact presented here. A trier of the facts would have no choice except to find, and I do find that:

1. As a result of two shocking disasters the necessity in the public interest that safety devices be installed was pressed upon the trustee by the Interstate Commerce Commission, the Public Service Commission of the State of New York, and the Long Island Rail Road Commission (a state body created specifically to deal with the problem of this railroad).

2. Failure or refusal on the part of the trustee to proceed promptly with the formulation and execution of a safety program would be detrimental to the interest of the public and would seriously impair or destroy the value of the railroad, and the interests of all of its creditors, including its tax creditors.

3. The trustee, recognizing his duty and even anticipating any formal order, formulated a safety program plan which was approved as the best available by all official expert opinion.

4. The reasonable cost of proceeding with the plan is approximately $6,000,000.

5. The debtor is unable at the present time to meet the cost of the safety program plan from its current assets or income, and borrowing under a suitable plan is essential.

6. The best available financing plan contains the condition that trustee's certificates be granted a paramount priority, and specifically a priority over all debts accrued on March 2, 1949 with interest thereafter accruing; all taxes (including interest and penalties) accrued and to accrue since March 2, 1949; and all obligations now or hereafter owing to the State of New York under the so-called Grade-Crossing Acts (discussed and considered in State of New York v. Gebhardt, 2 Cir., 1945, 151 F.2d 802).

7. It is impossible to obtain the needed financing except on these conditions.

8. All tax and grade crossing creditors, except the City of New York, and all secured creditors have conceded the power of the court to subordinate all claims, including tax and grade crossing claims and penalties and interest thereon now accrued or hereafter accruing, to the equitable lien of safety equipment creditors under the financing plan of January 19, 1951, and holders of trustee's certificates issued under that plan.

On the facts set forth above, it seems to me that the only permissible conclusions of law are as follows, that:

1. Under the circumstances presented the court has the power to grant a paramount priority to trustee's certificates issued for the purpose of purchasing and installing safety equipment heretofore found to be necessary.

2. Any safety equipment creditor or holder of trustee's certificates issued for the purpose of financing the installation of safety equipment has a peculiar equity superior to that of any other creditor in the case, including tax and grade crossing creditors.

3. Any holder of trustee's certificates issued for the purchase and installation of safety equipment has an equitable lien paramount to liens legal or equitable held by

---

1. Incidentally, a very early case (Wallace v. Loomis, 1877, 97 U.S. 146, 24 L.Ed. 895) referring to the power of the court to give reorganization certificates a paramount lien, although it does not discuss specifically tax liens, points out that

where the parties most materially interested either expressly consent to the plan or offer no objection to it, the order is not even open to review at the instance of an interested party who neglected promptly to challenge the court's power.

 

other creditors and specifically senior and prior in right to the liens of tax and grade crossing creditors.

I have tried in this decision and in these findings and conclusions to deal solely with the question of priority of trustee's certificates over the rights of tax creditors and secured creditors. Obviously the claims of unsecured creditors are subordinate to any loans made during administration to the trustee for the purchase and installation of safety equipment. It should be unnecessary for me to point out that if such equipment is not installed, grave consequences to the public and to the property will probably ensue, to say nothing of the fact that another disaster would be likely to bring in its wake huge financial obligations of the trustee to tort claimants, and other unthinkable results. I have not explored the consequences, in law and in equity, flowing from the fact that substantially the trustee is complying with orders of public bodies made in the public interest, and that since safety devices are a matter of exclusive federal concern, it may be that a question exclusively federal is presented here.

On the other hand, I have tried, as the minutes will show, to formulate my decision in such wise that the rights of all creditors should receive the maximum protection that can be given them under the circumstances. Counsel for the trustee proposes soon to bring on a proceeding under subdivision c (3) of Section 77, 11 U.S.C.A. § 205, sub. c (3), looking toward the validation of trustee's certificates. But, in addition to that, I realize my duty where possible not to increase the indebtedness of the estate, and to meet the cost even of safety equipment out of current assets and earnings, again where possible. To that end, after the completion of the proceeding under the statute just referred to, I intend, before any certificates are actually issued, to give appropriate notice to permit interested parties to challenge the necessity for any borrowing at that time, or the reasonableness of the particular proposed equipment cost and incidental expense for which each installment of borrowing is to be used. I mention installment borrowings because it is the intention of the trustee to spread the cost over the time-period which will be unavoidable anyway for the physical installment of the equipment. I have, it is true, made a finding that $6,000,000 is a reasonable over-all price for the equipment proposed, but, as further protection, I intend to give the proper parties an opportunity to be heard when, so to speak, each specific bill is from time to time presented.

A declaratory judgment in accordance with the foregoing will enter.