**In the Matter of MID–WEST TAR PRODUCTS CORP., Bankrupt.**

**No. 10494.**

United States District Court
D. Maryland.

Oct. 26, 1956.

André W. Brewster and Venable, Baetjer & Howard, Baltimore, Md., for ancillary trustee.

Charles K. Rice, Asst. Atty. Gen., Andrew D. Sharpe, Benjamin H. Pester, Attys., Dept. of Justice, Washington, D. C., and Walter E. Black, Jr., U. S Atty., James H. Langrall, Asst. U. S. Atty., Baltimore, Md., for United States.

Harry Shapiro, Baltimore, Md., for Grant Thorn and Genevieve U. Thorn.

THOMSEN, Chief Judge.

In this proceeding the ancillary trustee of Mid-West Tar Products Corp., bankrupt, seeks an order requiring Maryland Trust Company to turn over to him for administration in the principal bankruptcy proceeding in the United States District Court for the Northern District of Indiana, 2,500 shares of Combustion Engineering Company stock and $2,411.09 cash. Adverse claims to the stock and cash have been filed by Grant Thorn and Genevieve U. Thorn, his second wife, and by the United States, which filed proper notices of tax liens against Thorn and his first wife before the bankruptcy of Mid-West. The issues are: (1) whether the case is within the summary jurisdiction of the bankruptcy court; (2) whether this court, in this ancillary proceeding, has jurisdiction to pass on the question of title to the stock between the trustee and the adverse claimants; and (3) if so, whether the trustee in bankruptcy is entitled to the stock. The decision of the third issue requires a consideration of the respective title, rights, equities and liens of the various parties. The referee issued a turnover order, and petitions for review have been filed by the United States and by the Thorns.

Findings of Fact.

Grant Thorn was the principal stockholder, director, president and moving spirit of the bankrupt, Mid-West Tar Products Corp., and of a number of related companies. He owned 76% of Mid-West stock; the other 24% was owned by Edwin G. Higgins and Robert J. Baabe, officers of the company, who held their stock under an agreement to sell it to Thorn at par at any time on his demand. During all material times, Grant Thorn was in complete control of the operations and business of Mid-West. The various corporations in which Thorn was interested had offices in Baltimore, where Thorn lived and filed his income tax returns.

Before 1935, when Mid-West was organized, Thorn had acquired 2,913 shares of stock of Combustion Engineering Superheater Co., now known as Combustion Engineering Co. Some of the stock was originally issued in his name and some in the name of his first wife, Hazel Thorn, who signed blank stock powers and permitted Thorn to hold the certificates. In 1945, when Thorn was having difficulties with his wife, all of this Combustion stock was placed in the name of Higgins, as nominee of Thorn. Thereafter, Thorn acquired additional Combustion stock, some of which was placed in the name of Higgins and some in the name of Baabe. As a result of stock splits before November, 1950, 10,239 shares then stood in the name of Higgins and 1,761 shares in the name of Baabe.

Most of Thorn's corporations, including Mid-West, borrowed money from time to time from Maryland Trust Company and other banks, and Thorn made the Combustion stock available to the several corporations as security for such loans. Thorn also guaranteed personally many of the bank loans of the different corporations.

In January, 1947, Maryland Trust made a loan to Eastern Road Material Corp., one of Thorn's corporations, which was secured by some of the shares of Combustion stock. That loan was repaid.

In October, 1947, Maryland Trust made a loan to Thorn personally which was secured by shares of said stock. That loan was repaid.

By an undated agreement, which was prepared for signature before January 1, 1950, Higgins agreed with Maryland Trust as follows:

"I Hereby Declare That Mid-West Tar Products Corp. (hereinafter called 'Pledgor'), has my full consent to pledge 9,000 shs. Combustion Engineering Superheater, Inc. with the Maryland Trust Company (hereinafter called 'Bank') as collateral for any loan to Pledgor, and for any indebtedness of any nature whatsoever to said Maryland Trust Company for which said Pledgor may be liable, and that so long as said above mentioned securities may remain in the custody of said Bank, I expressly ratify and agree in advance to any and all agreements which said Pledgor may make with the Bank regarding the use of said collateral or any such indebtedness of said Pledgor to the Bank whether as maker or endorser or otherwise, and I expressly authorize the Bank to sell said securities at public or private sale in accordance with the terms of any note or agreement which said Pledgor may give to represent said loans or other indebtedness or liability to said Bank and/or redeliver said securities to said Pledgor upon repayment of said loans and all other indebtedness, And I do hereby agree to save the Bank harmless and indemnified forever against any result which may follow such action.

/s/ Edwin G. Higgins

"Witness:
"/s/ Robert J. Baabe"

On February 10, 1950, Maryland Trust made a loan to Mid-West which was secured by shares of said stock. That loan was repaid before November 16, 1950.

On November 16, 1950, Maryland Trust Company made a loan of $253,000 to Grant Thorn personally, which was se-cured by the 12,000 shares of Combustion stock referred to above. On the same day Thorn turned the $253,000 over to Eastern Road Material Corp. and that company checked it out. Five days later, on November 21, 1950, $253,000 passed in and out of Eastern Road again, going this time to Eastern Tar Products Corp., another corporation of Thorn's.

On November 27, 1950, Thorn arranged for Maryland Trust to lend $199,-000 to Mid-West, and $66,000 to Eastern Road, on the security of the Combustion stock. $190,000 of the $199,000 and $63,-000 of the $66,000 were used to repay to Maryland Trust the $253,000 loan which that bank had made to Thorn on November 16, 1950. The 12,000 shares of Combustion stock were thereby made available to secure the new loans; 9,000 shares were used to secure the $199,000 loan to Mid-West, and 3,000 shares to secure the $66,000 loan to Eastern. The note for the $199,000 loan to Mid-West was signed by Thorn as president of Mid-West, and endorsed by Thorn individually.

Maryland Trust made four additional loans to Mid-West, as follows: December 1, 1950—$15,750; December 12, 1950—$5,250; December 12, 1950—$26,000; February 1, 1951—$9,000. The notes for all of these loans stated on their face that they were secured by "collateral previously pledged". They were not endorsed by Thorn individually, but he had signed a guarantee agreement with Maryland Trust which covered all of these loans. The proceeds of these four loans were probably used for the corporate purposes of Mid-West, including the reduction of its indebtedness to Consumers Company, hereinafter referred to.

On February 8, 1951, Mid-West repaid $27,000 of its loans to Maryland Trust, and Maryland Trust released 1,000 shares of the Combustion stock, taking a receipt signed Mid-West Tar Products Corp., Robert J. Baabe, secretary. This stock was then pledged to Harrisburg Trust Company as security for a loan to Eastern Road Material Corp.

There is nothing on the records of Maryland Trust to show who was the equitable owner of the Combustion stock.

In November, 1950, and thereafter until the loans were liquidated, all of the shares remained registered in the names of Higgins or Baabe, who admit that they never had any beneficial interest in any of the shares which were registered in their names as nominees.

The books of Mid-West do not show and never have shown any stock of Combustion as an asset of that company. Mid-West never reported dividends on Combustion stock in its income tax returns. Thorn did report such dividends in his income tax returns as income to him until November, 1951, when the United States filed tax liens against him. From time to time Mid-West gave Maryland Trust Company financial statements, the last of which was dated September 30, 1950. None of these statements ever included any Combustion stock as an asset.

On February 7, 1951, Thorn, as president of Mid-West, wrote a six page letter to First National Bank of Chicago, giving a history of Thorn's operations and soliciting a line of credit for Mid-West. Attached to the letter was a balance sheet of Mid-West dated December 31, 1950, and a profit and loss statement for the year 1950. Omitting irrelevant detail, the balance sheet read as follows:

"Assets

**Current Assets**

| | | |
|---|---|---|
| Cash on hand and in Banks | | $ 33,892.48 |
| Accounts Receivable | | 300,830.49 |
| Deferred Charges | | 5,107.23 |
| Inventory | | 46,645.48 |
| 9000 Shares Combustion Engineering-Superheater, Inc. | | 225,000.00 |
| (Present Market Value $405,000.00) | | |
| | | 610,475.68 |

**Fixed Assets**

| | | |
|---|---|---|
| Chicago property | | 31,006.07 |
| Cost of Land for New Plant | 54,635.00 | |
| Less First Mortgage | 21,000.00 | |
| | | 33,635.00 |
| Advances for New Plant | | 37,500.00 |
| | | $712,616.75 |

Liabilities

**Current Liabilities**

| | | |
|---|---|---|
| Notes payable City Natl. Bank & Tr. Co. | | 89,548.56 |
| "       "     First Natl. Bank in E. Chgo. | | 24,155.84 |
| "       "     Union Natl. Bank of Ind. Harbor | | 25,938.17 |
| "       "     Maryland Trust Co. | | 225,000.00 |
| Accounts payable | | 92,317.75 |
| Accrued Expenses | | 16,636.06 |
| | | 473,596.38 |
| Reserve for Taxes | | 5,897.12 |
| Capital | $100,000.00 | |
| Surplus | 115,781.21 | |
| Profit | 17,342.04 | |
| | 133,123.25 | |
| Capital and Surplus | | 233,123.25 |
| | | $712,616.75" |

The profit and loss statement showed a profit of $17,342.04 for the year 1950.

On February 20, 1951, Thorn sent an exactly similar letter, together with copies of the same statements, to the treasurer of Consumers Company. Mid-West had owed Consumers about $50,000 toward the end of 1950, but that balance had been greatly reduced by February, 1951.

Thorn testified that he told the vice-president of the Chicago bank and the treasurer of Consumers that the 9,000 shares of Combustion stock shown on Mid-West's balance sheet belonged to him. I find it incredible that Thorn told them this, because if that asset were eliminated from the balance sheet, or were matched by a corresponding contingent liability to Thorn which would become absolute if and when Maryland Trust sold the stock to pay the loan, the net worth of Mid-West would be reduced to less than $10,000.

Mid-West's bookkeeper, Stackhouse, testified that he had prepared the December 31, 1950, balance sheet as a regular year end statement, and that he thought it was prepared in a proper manner to show that the stock belonged to Thorn and had been pledged to secure the debt to Maryland Trust. Although Stackhouse may have been an incompetent bookkeeper, it is incredible that he prepared the balance sheet in that way except under instructions from Thorn. Thorn admits that he was familiar with the balance sheet; he signed, as President of Mid-West, the two copies which were sent to the Chicago bank and to Consumers, respectively. I find that the balance sheet was prepared as it was in an effort to induce the Chicago bank, Consumers, and perhaps others, to extend substantial credit to Mid-West. Thorn wanted Consumers to sell heavy fuel oil to Mid-West on credit.

The referee found that Thorn made statements to Johnson, treasurer of Consumers, specifically to lead Johnson to believe that the Combustion stock was an asset of Mid-West, and that Thorn did not disclose to Johnson that the Combustion stock was pledged with Maryland Trust. I accept this finding. The referee further found that, in reliance on the December 31, 1950, balance sheet, Consumers sold fuel oil to Mid-West on credit. I find that between March 1, 1951, and August 30, 1951, Consumers Company sold oil to Mid-West on open account, and received various payments. The balance due on August 30, 1951, was $22,207.42, and has been reduced by credits since that date to $11,819.17.

Thorn testified and I find that cash deposited to the credit of one of his companies was habitually used to pay debts of others of his companies. He produced cancelled checks, in the total amount of $776,475.16, drawn by Eastern Road Material Company, Eastern Tar Products Corp., Mid-West Road Material Corp., and Mid-West Tar Products Corp., mostly during 1951, but some earlier, which he testified were issued in payment of or on account of debts due by Mid-West Tar. It would require an elaborate audit to check the accuracy of this testimony. It appears from a comparison of some of the checks with other exhibits in evidence that money of other companies was used during 1951 to pay debts of Mid-West; but without an audit to show what money of Mid-West had been used to pay debts of other companies, these exhibits serve principally to support the testimony of Thorn, confirmed by other exhibits, that he continually used the funds of one corporation to pay the debts of another.

On October 15, 1951, Thorn married his second wife, Genevieve U. Thorn. She testified before the referee that, before they were married, Thorn told her "that after we would be married I would own one-half of everything he had, jointly as man and wife". Grant Thorn testified before me to the same effect. The referee made no finding with respect to this alleged agreement. I find that no such agreement was made. If such a conversation took place, it was merely a statement of Thorn's understanding or misunderstanding of the law.

On November 5, 1951, the Commissioner of Internal Revenue made assessments totaling $679,557.04 against Grant Thorn for income tax deficiencies for the years 1943 to 1948, both inclusive. Some part of the assessments were also made against Hazel Thorn, his first wife. The assessment list was received by the Collector of Internal Revenue in Baltimore on November 5, 1951. It was filed for record with the Clerk of the Superior Court of Baltimore City on November 17, 1951, and with the Clerk of the United States District Court for the District of Maryland on December 3, 1951. Both Maryland Trust, as pledgee, and Chase National Bank of the City of New York, as transfer agent for the Combustion stock, were promptly notified of the tax liens.

Between September 11, 1952, and December 5, 1952, Maryland Trust exercised its security rights and sold 5,500 shares of the 8,000 remaining in its hands and used the proceeds to pay off Mid-West's indebtedness to it. Out of the proceeds there remains in the bank's hands $2,411.09. It also holds the remaining 2,500 shares, which are registered in the name of Higgins. These shares have since been split three for one, so that Maryland Trust now holds the equivalent of 7,500 new shares.

### The Proceedings.

On November 12, 1952, involuntary bankruptcy proceedings were instituted against Mid-West Tar Products Corp. in the United States District Court for the Northern District of Indiana, Hammond Division. Adjudication was had on February 19, 1953, and Robert A. Lucas was appointed trustee on April 2, 1953.

On July 21, 1953, Maryland Casualty Company filed an attachment proceeding in the Baltimore City Court, claiming that Grant Thorn owed it $18,651.45 on indemnity agreements signed by him in connection with bonds executed by Maryland Casualty as surety for Eastern Tar and Eastern Road, and laid the attachment in the hands of Maryland Trust as garnishee.

On December 17, 1953, the United States of America filed suit in this court, Civil No. 7034, against Grant Thorn, Hazel Thorn, Creosote Sales Corporation, Genevieve Thorn, Maryland Trust Company, Edwin G. Higgins, Mrs. Nancy P. Higgins, Robert J. Baabe, R. J. King, William J. Stackhouse, and Robert A. Lucas. In the body of the complaint Lucas was described as trustee in the bankruptcy proceedings against Mid-West Tar Products, Inc. The United States asserted the tax liens, totaling $679,557.04, with interest, alleged many but not all of the facts set out in my findings above, and prayed: (1) for a decree that Grant Thorn is indebted to the government in the amount of $679,557.04, with interest; (2) that the defendants therein be required to answer the complaint and set forth any claims they may have to the 2,500 shares of Combustion stock and the $2,411.09 held by Maryland Trust as aforesaid; (3) that the merits of all claims to and liens upon the property be finally determined; (4) that the interest, liens and claims of the government be established and enforced; (5) that the property be distributed according to the respective rights and interests of the United States and the several defendants; and (6) for other and further relief.

No answer has ever been filed to that complaint by Lucas individually or as trustee in bankruptcy of Mid-West; he had an understanding with counsel for the government that he need not file such an answer before the termination of the instant proceeding.

In December, 1953, Lucas, as trustee in bankruptcy of Mid-West, filed in the Indiana bankruptcy proceedings a petition requesting that the Maryland Trust be directed to turn over to him as such trustee in bankruptcy the 2,500 shares of Combustion stock and the $2,411.09 cash. That petition was answered by Maryland Casualty, which moved to dismiss on the grounds that there was no jurisdiction in the Northern District of Indiana, and by the United States, which

asserted a claim to the property and also moved to dismiss for lack of jurisdiction. After filing the instant proceeding in Maryland, the trustee in bankruptcy consented to the dismissal of the turn over proceedings in Indiana.

On January 14, 1954, on the ex parte petition of the trustee in bankruptcy, the District Court in Indiana enjoined the United States from proceeding with said Civil Action No. 7034 in this Court. After hearing, however, that restraining order was removed in January, 1955.

On September 8, 1954, the trustee in bankruptcy of Mid-West filed a petition in the Indiana proceeding for leave to institute ancillary proceedings in the District of Maryland. An order was entered granting such leave and authorizing the trustee "to marshal all the assets of the said bankrupt in said District".

Pursuant to that order, the trustee in bankruptcy filed the pending ancillary proceeding in this court, alleging some but not all of the facts set out in my findings above, and praying: (1) that a rule be entered on Maryland Trust, Maryland Casualty, Thorn, Higgins and the United States, to answer the petition; and (2) that an order be entered herein directing Maryland Trust to deliver possession of the Combustion stock to Lucas as trustee. On that petition, Judge Coleman appointed Lucas ancillary trustee and ordered the parties named in his petition to show cause why the relief prayed should not be granted. Lucas duly qualified by filing bond.

The various parties named have appeared and answered. Grant Thorn alleged that the stock is the property of Grant Thorn and Genevieve Thorn, his wife, and prayed that the petition of the trustee be dismissed. Maryland Trust disclaimed any interest in the stock and cash held by it except for an allowance of compensation to its counsel for defending it against the conflicting claims and demands made against the stock. Higgins disclaimed any beneficial interest in the stock. Maryland Casualty alleged that the stock belonged to Grant Thorn; that Grant Thorn was indebted to it in the amount of $18,651.45 on indemnity agreements; and prayed that the petition of the trustee in bankruptcy be dismissed, and that an order be passed to protect its rights in and to said stock. Recently Maryland Casualty has dismissed its attachment proceeding in the Baltimore City Court and has consented to an order dismissing it as a party to this ancillary proceeding.

The United States answered, asking that the petition of the trustee in these ancillary proceedings be dismissed on the grounds that the United States is a bona fide adverse claimant to the property with a real and substantial claim thereto, that the United States has a valid, perfected lien against the property for unpaid income taxes, and that the property is not in the actual or constructive possession of this court.

Judge Coleman referred the matter to the then referee in bankruptcy, J. Martin McDonough, Esq. Depositions were taken and filed, and evidence was heard by the referee. Following those hearings the referee made findings of fact, and entered an order, dated December 7, 1955, directing Maryland Trust to turn over to Lucas, as ancillary trustee, the 2,500 shares of Combustion stock and the $2,411.09 cash. The referee decided that this court has summary jurisdiction of the controversy; that it is not necessary to decide whether title to the assets is in the bankrupt or in Thorn; that a creditor of the bankrupt corporation who extended credit in reliance upon representations by the corporation and its controlling stockholder as to the assets of such corporation, prevails over such stockholder and those claiming through him, as to those assets which the stockholder now seeks to claim are his own and not those of the corporation; and that the trustee could assert the right of such creditor on behalf of all creditors. The referee gave no reason for the last conclusion.

Conclusions of Law and Discussion.

1. The first question is whether the controversy comes within the summary jurisdiction of a bank-

ruptcy court. The general rule is stated in Cline v. Kaplan, 323 U.S. 97, at pages 98–99, 65 S.Ct. 155, at page 156, 89 L.Ed. 97:

"A bankruptcy court has the power to adjudicate summarily rights and claims to property which is in the actual or constructive possession of the court. Thompson v. Magnolia Petroleum Co., 309 U.S. 478, 481, 60 S.Ct. 628, 629, 84 L.Ed. 876. If the property is not in the court's possession and a third person asserts a *bona fide* claim adverse to the receiver or trustee in bankruptcy, he has the right to have the merits of his claim adjudicated 'in suits of the ordinary character, with the rights and remedies incident thereto.' Galbraith v. Vallely, 256 U.S. 46, 50, 41 S.Ct. 415, 416, 65 L.Ed. 823; Taubel-Scott-Kitzmiller Co. v. Fox, 264 U.S. 426, 44 S.Ct. 396, 68 L. Ed. 770. * * *"

See also In the Matter of Brokol Manufacturing Co., 3 Cir., 221 F.2d 640. The ancillary trustee contends, however, that where a third person holds possession of the bankrupt's property, and makes no adverse claim to it, that person will be subject to summary jurisdiction, even though others make claims adverse to the bankrupt. 2 Collier on Bankruptcy, sec. 23.06, p. 493. "Property held for the bankrupt by another who makes no claim to it may be summarily collected by the bankruptcy court, despite the fact that third persons make claims adverse to the bankrupt. Orinoco Iron Co. v. Metzel, 6 Cir., 230 F. 40; In re Hoey, Tilden & Co., D.C., 292 F. 269. See also Buss v. Long Island Storage Warehouse Co., 2 Cir., 64 F.2d 338, 339. This is on the theory that the bankruptcy court came into constructive possession of the property when the petition was filed, and as to property in its possession the court may determine the rights of claimants in summary proceedings." Matter of Goldman, D.C.S.D.N.Y., 5 F.Supp. 973, 974 (Patterson, D.J.). Since Maryland Trust, which is holding the stock and the cash, makes no claim to them, except for counsel fees, the question is whether the

stock which Maryland Trust is holding belongs equitably to the bankrupt, Mid-West, or to some one else. The allegations made by the ancillary trustee in his petition filed in this proceeding give a bankruptcy court summary jurisdiction to pass on that question, and to decide whether the law and the facts justify a turn over order, requiring Maryland Trust to deliver the stock and the cash to the ancillary trustee.

■ 2. The ancillary trustee also contends that since this court is exercising ancillary jurisdiction, it should issue a turn over order forthwith, and let the District Court in Indiana decide the respective title, rights, equities and liens of the various parties. This argument, however, ignores the controlling authorities and the order of the Indiana court.

Sec. 2, sub. a(20) of the Bankruptcy Act, 11 U.S.C.A. § 11, sub. a(20), provides that courts of bankruptcy may: "Exercise ancillary jurisdiction over persons or property within their respective territorial limits in aid of a receiver or trustee appointed in any bankruptcy proceedings pending in any other court of bankruptcy; *Provided, however*, That the jurisdiction of the ancillary court over a bankrupt's property which it takes into its custody shall not extend beyond preserving such property and, where necessary, conducting the business of the bankrupt, and reducing the property to money, paying therefrom such liens as the court shall find valid and the expenses of ancillary administration, and transmitting the property or its proceeds to the court of primary jurisdiction". In Butler v. Ellis, 4 Cir., 45 F.2d 951, decided before the Act of 1938 added the present proviso to sec. 2a(20), the court, speaking through Judge Parker, said:

"On the first question, we think there can be no doubt as to the power of the court to determine the liens upon the property which it had seized and taken into possession through its receivers. The ancillary receivers were appointed pursuant to the power granted to the court to 'exercise ancillary jurisdiction

over persons or property' within its territorial limits 'in aid of a receiver' appointed by another court of bankruptcy. Bankruptcy Act § 2(20), as added by Act June 25, 1910, § 2, 36 Stat. 838, 11 U.S.C.A. § 11(20). The seizure of property as belonging to the bankrupt necessarily implied the power and duty of determining the ownership of the property seized; and the determination of ownership necessarily involved the ascertainment and adjudication of liens asserted against it. It is unthinkable that, in authorizing the district courts to exercise ancillary jurisdiction in aid of a receiver or trustee in bankruptcy appointed in another jurisdiction, it was intended that these courts should do no more than seize property designated by the officer of the foreign court and, without hearing those who adversely claim the property or an interest therein, turn it over to be administered in a jurisdiction hundreds of miles removed from the residence of the claimants. The first duty of a court is to do justice; and it is manifest that, when through its receiver it lays its hands on property, and thus renders it impossible for any other court to determine the ownership thereof or the rights of property therein, justice requires that it should itself hear and pass upon the claims of those who assert that the property belongs to them and not to the bankrupt, or that they have the right to have it applied in satisfaction of liens, and that the only interest of the bankrupt, or of those who have succeeded to his rights, is held in subordination thereto." 45 F.2d at pages 952, 953.

To the same effect is In re Rodgers & Garrett Timber Co., D.C.D.Md., 22 F.2d 571, 574, where Judge Coleman said: " * * * the weight of authority supports what seems to be the proper rule, namely, that a court of ancillary jurisdiction has power to determine priorities and liens in regard to property brought within its jurisdiction, and to pass such orders as may be necessary in connection with the satisfaction of same." The Amendment of 1938 has not changed the

rule. Collier, 14th ed., vol. 1, sec. 2.76, p. 323, says that under sec. 2, sub. a(20) as now constituted, the ancillary court "may hear and adjudge claims to such property", and refers to "the power of the ancillary court to determine ownership, priorities and liens for the benefit of claimants to the specific property in its possession". This rule was recognized by the Indiana court in the instant case, for its order directed the trustee in bankruptcy to apply for an appointment as trustee of all the assets of the bankrupt in the District of Maryland, "with authority to marshal all the assets of the said bankrupt in said district".

3. The third and principal question, therefore, is whether the trustee in bankruptcy of Mid-West is entitled to the stock and the cash now being held by Maryland Trust. This requires a consideration of the respective title, rights, equities and liens of the various parties.

The trustee in bankruptcy contends that the inclusion of the 9,000 shares of Combustion stock among the assets of Mid-West in the balance sheet sent by Thorn to the Chicago bank and to Consumers in February, 1951, together with Thorn's acquiescence in the pledge of the stock by Mid-West as security for its debt to Maryland Trust, shows a contribution by Thorn of said stock to the capital of Mid-West. This contention, however, is not supported by the facts or by the law. Thorn pledged the Combustion Engineering stock first for a loan to one of his corporations and then for a loan to another. He personally guaranteed all or most of such loans. Even after the 9,000 shares in question had been pledged with Maryland Trust in November, 1950, to secure a loan to Mid-West, 1,000 shares were withdrawn and pledged to another bank to secure a loan to another one of Thorn's corporations. The proceeds of the various loans were used for the benefit of all the corporations and of Thorn, not just for the benefit of the corporation making the loan. The dividends on the Combustion stock were reported as income by Thorn

on his income tax returns, and were never reported as income by Mid-West. I find that there was no voluntary or conscious contribution of the stock by Thorn to the capital of Mid-West or of any other of his corporations.

The deposit of the stock with Maryland Trust to secure loans to Mid-West made the stock liable for such loans; but the facts do not support the contention of the trustee that the stock thereby became part of Mid-West's capital, intended to be subject generally to the risks of its business. A similar contention was made in Walker v. Wilkinson, 5 Cir., 3 F.2d 867. The court in that case said:

"Without denying that that contention should prevail, if the ground relied on to support it existed in fact, we are of opinion that it cannot properly prevail, because the evidence adduced did not prove that the money of the appellant which went into the trustee account was intended by him to be used as capital of the bankrupt, or to be subject generally to the risks of the bankrupt's business. Before and after that money went into the trustee account, the appellant, by written contract with the bank, was personally obligated to guarantee 'any overdraft or other obligations, liability, or indebtedness' to the bank 'which may at any time be created or exist' against the bankrupt. That obligation was incurred in favor of the bank alone, and the bank alone became entitled to the benefit of the additional security afforded by the trustee account deposit. One who furnishes security for specified liabilities of another does not by so doing make what he puts up as security the property of the debtor, or subject to all of the latter's liabilities. This is true, though the furnisher of security is a stockholder of a corporation which has some of its liabilities so secured. What is so put up as security does not become an asset of the corporation, and subject to be applied to the satisfaction of its liabilities generally." 3 F.2d at page 871.

See also Brown v. Freedman, 1 Cir., 125 F.2d 151.

Nor did the inclusion of the stock in the balance sheet of Mid-West sent by Thorn to the Chicago bank and to Consumers show conclusively that Thorn intended to make a contribution of the stock to Mid-West. Based on the findings of fact which I have made, the manner in which the stock was included in the balance sheet was clearly improper and was either fraudulent or grossly negligent. Thorn's actions in connection therewith undoubtedly made him personally liable to Consumers for any credit extended by Consumers to Mid-West on the strength of that statement, and would have made him similarly liable to the Chicago bank. 3 Fletcher's Cyclopedia, Corporations, sec. 1146; 19 C.J.S., Corporations, § 850(b). As against those two corporations and any other person, firm or corporation which extended credit to Mid-West on the strength of that balance sheet, Thorn is estopped to deny that Mid-West is the owner of the Combustion stock. So is anyone claiming under Thorn, except a bona fide purchaser of such stock or a person having a lien, claim or equity on, to or in said stock equal or superior to that of Consumers. But such an estoppel does not create title in Mid-West, where no such title existed in fact. It operates in favor of Consumers and of any other person, firm or corporation which extended credit to Mid-West on the strength of the representation made in the balance sheet. It does not operate in favor of other creditors of Mid-West, who did not extend credit on the strength of those representations, and some of whom participated in the numerous transfers and pledges of the stock. There is no reason in law or in equity why those other creditors of Mid-West should receive the benefit of the Combustion stock as against the creditors of Thorn, who was the equitable owner of the stock

*A fortiori*, the stockholders of Mid-West, the very people who participated in the transfers and pledges of the stock, should not receive the benefit of the stock as against the creditors of Thorn.

■ The principal creditor of Thorn is the United States, which has a tax lien for income taxes unpaid in the amount of $679,557.04. That tax lien attached on November 5, 1951, a year before the bankruptcy proceedings against Mid-West were filed in Indiana. Notices of the lien were duly filed on November 17, 1951 and December 3, 1951. The government takes the position that Thorn was the equitable owner of the stock, subject to liens; that it is a question of priority of liens, and that the government's lien comes first under secs. 3670–3672 of the Internal Revenue Code of 1939, 26 U.S.C.1952 ed., §§ 3670–3672. People of State of Illinois ex rel. Gordon v. Campbell, 329 U.S. 362, 374, 375, 67 S.Ct. 340, 91 L.Ed. 348; United States v. State of Texas, 314 U.S. 480, 486, 487, 62 S.Ct. 350, 86 L.Ed. 356; United States v. Scovil, 348 U.S. 218, 221, 75 S.Ct. 244, 99 L.Ed. 271; United States v. Acri, 348 U.S. 211, 75 S.Ct. 239, 99 L.Ed. 264; City of New York v. Johnson, 2 Cir., 137 F.2d 163, 165, 148 A.L.R. 516; United States v. Levin, D.C. D.Md., 128 F.Supp. 465; Collier, op. cit., vol. 4, sec. 70.50, p. 1267; sec. 70.52, p. 1277; sec. 70.54, p. 1284; sec. 70.64, p. 1322. " * * * the trustee, even under § 70c [11 U.S.C.A. § 110, sub. c], is not a *bona fide* purchaser. He stands in the shoes of the bankrupt subject to all the valid liens, claims and equities that existed against the bankrupt, and has no higher or better right except as given him by § 70c or some other express provision of the Act. Section 70c, however, confers upon the trustee only the rights of either a creditor holding a lien through legal or equitable proceedings, or a judgment creditor holding an exe-cution returned unsatisfied, as of the date of bankruptcy. Hence unless that grant has the effect under applicable state law of conferring upon the trustee a superior right over the equitable claimant, the trustee takes the bankrupt's title subject to all the valid equities, equitable liens or equitable assignments asserted against the bankrupt's property so far as § 70c is concerned." Collier, op. cit., vol. 4, sec. 70.62, pp. 1311–1312.

Under the facts and the authorities cited, Mid-West had no title to the stock. Counsel for the ancillary trustee admits that he has no lien. His request for a turn over order must be denied.

■ But Consumers and any other creditors of Mid-West who extended credit to Mid-West on the strength of the balance sheet sent them by Thorn in February, 1951, may have a superior equity or priority over Thorn's creditors, based upon the estoppel discussed above. The question then arises whether those rights, equities, and priorities should be determined in this proceeding. Although they might be, Butler v. Ellis, supra, it seems wiser to have them determined in the plenary proceeding filed in this court by the United States in December, 1953. So that the relatively few creditors of Mid-West may know of that proceeding, and may have the opportunity to file their claims therein if they believe that they have any equitable claims against the Combustion stock, I direct that the ancillary trustee herein send an appropriate notice of that proceeding, to be approved by this court, to all of the creditors of Mid-West who have filed their claims in the bankruptcy proceedings in Indiana.

The order of the referee dated December 7, 1955, is hereby reversed, and the petition of the ancillary trustee for an order directing Maryland Trust Company to turn over to him the Combustion stock and the $2,411.09 cash is hereby denied.