388 F.2d 156
 H. B. AGSTEN & SONS, INC., a corporation, Appellee,
v.
HUNTINGTON TRUST & SAVINGS BANK, a corporation, Appellant,
and Bernard L.Boutin, Administrator, Small
Business Administration, and Odus R.
Kincaid andDelbert E.
Williams, Trustees, Appellees.
 No. 11028.
 United States Court of Appeals Fourth Circuit.
 Argued April 6, 1967.
Decided Dec. 4, 1967, Certiorari Denied April 22, 1968, See
88 S.Ct. 1413.
 
 Selden S. McNeer, Jr., Huntington, W. Va. (Campbell, McNeer, Woods, Bagley & Emerson, Huntington, W. Va., on brief) for appellant.
 Howard R. Klostermeyer, Charleston, W.Va. (William B. Maxwell, III, and Spilman, Thomas, Battle & Klostermeyer, Charleston, W. Va., on brief) for appellee H. B. Agsten & Sons, Inc., and John C. Eldridge, Atty., Dept. of Justice (Barefoot Sanders, Asst. Atty. Gen., Morton Hollander and Robert C. McDearmid, Attys., Dept. of Justice, and Milton J. Ferguson, U.S. Atty., on brief) for Administrator and Trustees of Small Business Administration.
 Before HAYNSWORTH, Chief Judge, and SOBELOFF and BRYAN, Circuit Judges, and with the consent of the parties submitted to the Court en banc.
 SOBELOFF, Circuit Judge:
 
 
 1
 With the facts undisputed, the only issue for our determination in this circuity of lien priorities case is the proper distribution of the proceeds from a judicial sale of property.[1] We think that the District Court's disposition satisfactorily accommodates the competing interests of state and federal law and the opposing claims of the three litigants-- a mechanic's lienor, a mortgagee bank and the Small Business Administration. Accordingly, we affirm the court's decision to give priority to the bank and the remainder to the SBA, while requiring the bank to satisfy the mechanic's lien in full from its recovery.
 
 
 2
 On June 1, 1964, plaintiff H. B. Agsten & Son, Inc. began construction of a motel for the West Virginia Industries Development Corporation on a 31-acre tract of land owned by the developer in Mason County, West Virginia. Almost four months thereafter, on September 22, 1964, to help finance the venture, West Virginia Industries borrowed from the Huntington Trust & Savings Bank $400,000.00, secured by a recorded deed of trust conveying the tract to the Bank's trustees. Finding itself in need of more capital one month later, West Virginia Industries executed and on October 30, 1964, recorded a second deed of trust conveying the same property to secure a loan of $1,042,500.00 from the Small Business Administration. This agreement provided:
 
 
 3
 'This Deed of Trust and warranty of title herein are made subject to and subordinate to a prior deed of trust executed by the grantor herein to secure a loan in the amount of $400,000.00 over the premises herein conveyed, and now of record in the office of the Clerk of the County Court of Mason County, West Virginia.'
 
 
 4
 There can be no doubt, as the Special Master to whom the District Court referred this case found, that this language alluded to the Bank's earlier loan to West Virginia Industries.
 
 
 5
 After substantially completing the motel in June, 1965, Agsten timely recorded a notice of mechanic's lien in the county clerk's office for $217,098.33, the balance admittedly due the contractor. With its debtor insolvent, Agsten instituted this action in a state court of West Virginia, seeking a determination of the validity and priority of outstanding liens against the property of West Virginia Industries, and requesting a sale to satisfy these liens. SBA, a named defendant, had the case removed to the Federal District Court.
 
 
 6
 The circuity of lien priorities arises because of an apparent conflict between certain federal and state statutes, whose applicability in this case is undisputed. The Federal Insolvency Statute, 31 U.S.C. 191, provides:
 
 
 7
 'Whenever any person indebted to the United States is insolvent * * *, the debts due to the United States shall be first satisfied; and the priority established shall extend * * * to cases in which an act of bankruptcy is committed.'
 
 
 8
 Since the parties do not contest the Special Master's finding that West Virginia Industries was insolvent and had committed the requisite act of bankruptcy, it is clear that the claim of the SBA, a federal agency, is entitled to preference over Agsten's mechanic's lien, which was inchoate when the SBA loan was made. See Small Business Administration v. McClellan, 364 U.S. 446, 81 S.Ct. 191, 5 L.Ed.2d 200 (1960); W. T. Jones & Co. v. Foodco Realty, Inc., 318 F.2d 881 (4th Cir. 1963). The Bank, however, enjoys a priority over SBA both because of the explicit language in SBA's deed of trust and because of a judicially-created exception to the insolvency statute in favor of previously executed mortgages. See United States v. State of Texas, 314 U.S. 480, 484, 62 S.Ct. 350, 86 L.Ed. 356 (1941). To complete the circle, Agsten has a claim superior to the Bank's by virtue of the laws of West Virginia.[2] The resulting paradox is that the Bank is behind the contractor and ahead of the SBA, which is in turn ahead of the contractor.
 
 
 9
 In resolving this problem, we follow what has been correctly termed the 'federal policy'[3] in this area. We start with the basic proposition that federal law determines the relative priority of conflicting claims where a federal agency is involved. United States v. Clover Spinning Mills Co., 373 F.2d 274, 276 (4th Cir. 1966). It is by applying federal law that we have determined that SBA's claim is superior to Agsten's but inferior to the Bank's. Federal law demands only that after the payment of the $400,000.00 to which the SBA is subordinated, this federal agency should be recompensed for its loan to the extent possible. At this point, the interest of the federal government terminates, and the ultimate disposition of the $400,000.00 is purely a matter of state concern. United States v. City of New Britain, 347 U.S. 81, 88, 74 S.Ct. 367, 98 L.Ed. 520 (1954). In our case, the State of West Virginia has determined by its statutes that the contractor is to be paid in full before the mortgagee's claim is satisfied.
 
 
 10
 New Britain is precisely in point here. Applying federal law, the Supreme Court found that certain liens of the United States were superior to a number of municipal liens but inferior to outstanding mortgage and judgment liens. However, under the relevant state law, the mortgage and judgment liens were inferior to the municipal liens. In reversing a disposition similar to one of those contended for by the appellant here, the Court declared:
 
 
 11
 'The United States is not interested in whether the State receives its taxes and water rents prior to mortgages and judgment creditors. That is a matter of state law. But as to any funds in excess of the amount necessary to pay the mortgage and judgment creditors, Congress intended to assert the federal lien.
 
 
 12
 On remand, the state court set aside the amount of the mortgage and judgment liens, ordered the remainder paid to the federal government, and directed payment of the municipal liens from the funds appropriated to the mortgage and judgment liens. Brown v. General Laundry Service, 19 Conn.Supp. 335, 113 A.2d 601 (1955). This is the very method employed by the District Court in the instant case and by a consistent line of federal authorities. See, e.g., In Re Lieb Bros., Inc., 251 F.2d 305 (3rd Cir. 1957); Exchange Bank & Trust Co. v. Tubbs Manufacturing Co., 246 F.2d 141 (5th Cir. 1957); United States v. Lord, 155 F.Supp. 105 (D.N.H.1957). See also Samms v. Chicago Title & Trust Co., 349 Ill.App. 413, 111 N.E.2d 172, 176 (1953). The fact that the lien in New Britain arose under the federal tax laws while in this case the priority emanates from a contractual obligation, is not a legally significant distinction in resolving the issue before us. Although, as we shall show, the substantive scope of the federal tax laws differs from that of the Federal Insolvency Statute, the technique to be utilized in reconciling the divergent interests, once they have been determined, should be the same.
 
 
 13
 The result we reach here is justified not only by precedent but also by sound policy considerations. Agsten began improving the land in June, 1964, secure in the knowledge that state law accorded it a priority over any subsequent local mortgage. When the bank advanced money to West Virginia Industries nearly four months later, it must be presumed to have been well aware that its repayment would be subordinated to the prior mechanic's lien. The fortuitous appearance of a federal agency one month later should not inure to the Bank's benefit by depriving the contractor of its $217,000. Similarly, it is proper that SBA be paid all of the excess over $400,000, the specific amount by which the law and its agreement purported to subordinate its claim. If the SBA were subordinated not only to previously executed mortgages but also to inchoate mechanic's liens, there is a possibility it would refuse to make such loans, thereby diminishing the effectiveness of the Small Business Act, 15 U.S.C. 631-651. And had the SBA declined to make its million dollar loan, the Bank might on insolvency of the landowner recover less because, as no federal law would be involved, Agsten would come ahead of the Bank in the distribution of a fund not enhanced by the massive federal investment.
 
 
 14
 Neither of the Bank's suggested alternative solutions achieves a similarly desirable reconciliation of the respective interests. The Bank first posits a theory whereby $217,000 is awarded to Agsten, then the Bank is paid in full, and finally SBA is decreed the remainder. This alternative, which would emasculate the Federal Insolvency Statute, was specifically rejected by the Supreme Court in the New Britian case, supra.
 
 
 15
 The second approach, which the Bank urges more strenuously, would first set aside the $217,000 owed to Agsten, but pay it to the SBA instead of Agsten, for SBA is superior to the building contractor under the federal statute. The Bank would then be repaid in full, with the remainder going to SBA. The net result would be that the Bank would enjoy full recovery, the SBA would recoup more than half of its outlay and Agsten would be cut out completely. This solution offends the West Virginia lien statutes, which unequivocally afford a preference to mechanic's liens; the Federal Insolvency Statute, which is not meant to inure to the benefit of private creditors vis-a-vis other private creditors; and our sense of equity, which demands that this contractor who improved the land should not go uncompensated.
 
 
 16
 In short, while the Bank complains that it is the only party which suffers from the District Court's disposition, the fact is that it 'suffers' only in the sense that by the operation of the West Virginia law and not by reason of the Federal Insolvency Statute, it will regain only about half of its loan. It should also be noted that the Bank is the one party involved which could have protected itself. It could have safeguarded its interest by obtaining a waiver of earlier mechanics' liens before making the loan. By contrast, SBA had no reason to guard against a mechanic's lien, from which it is protected by federal law. Similarly, Agsten had no need to seek protection against the Bank's future mortgage, for the West Virginia statute explicitly afforded it this security.
 
 
 17
 It has been suggested that the Federal Tax Lien Act of 1966, Pub.L.No. 89-719, 80 Stat. 1125, amending 26 U.S.C. 6323, impliedly calls for a different result in this case. The thesis is that since the recent legislation subordinates unrecorded federal tax liens to mechanics' liens, federal contractual claims should be similarly affected. If accepted, this theory would result in paying both the contractor and the Bank in full before applying any of the proceeds to SBA's claim. The language and legislative history of the statute, however, convince us that Congress did not purpose to elevate inchoate mechanics' liens over federal contractual claims. The terms of the statute and the detailed Committee reports of both houses of Congress[4] speak repeatedly of subordinating federal unrecorded tax liens to mechanics' liens, never intimating a design to broaden the subordination to include other federal claims.
 
 
 18
 The 1966 amendment, insofar as it pertains to our present inquiry, is simply the latest in a series designed to effect precisely limited expansions of the category of secured creditors protected from secret federal tax liens.[5] The insolvency statute at issue here, and the tax lien law are entirely separate entities, no matter how related they may become upon occasion. Covering all debts owing the federal government by an insolvent debtor, the insolvency statute, as has long been established, does not create a lien but simply establishes a priority. Beaston v. Farmers' Bank of Delaware, 12 Peters 102, 134, 9 L.Ed. 117 (U.S.1838); United States v. Fisher, 2 Cranch 358, 390, 2 L.Ed. 304 (U.S.1805). On the other hand, the revenue act, by its terms applies only to tax debts, does create a lien and encompasses all taxpayers regardless of their solvency. In the most scholarly and comprehensive article yet written about the new tax law, Professor Young of Columbia Law School observes that the Federal Insolvency Statute and the 1966 Federal Tax Lien Act raise an 'entirely different set of issues.' Young, Priority of the Federal Tax Lien, 34 U.Chi.L.Rev. 723, 725 (1967).
 
 
 19
 The inapplicability of the tax law is underscored by a recent Supreme Court decision, which ruled that the tests for determining the choateness of an earlier lien differ depending upon whether the insolvency statute or the tax lien law is involved. United States v. State of Vermont, 377 U.S. 351, 357, 358, 84 S.Ct. 1267, 12 L.Ed.2d 370 (1964). Interestingly, the Court's approach is consistent with the 1966 amendment insofar as the decision gives a prior lien a better chance against a federal tax lien than against an insolvency priority.
 
 
 20
 We cannot say that it is illogical for Congress to deem it desirable to retain a priority for money it loans, while relinquishing the priority for its tax liens, which represent no financial outlay. Whatever may be the merits of symmetry in these two quite distinct, if cognate, areas the argument seems more properly addressed to Congress than to this court.
 
 
 21
 Finally, in brief response to our Brother Bryan we observe, with deference, that his dissent is marked by two basic fallacies. The first is the unsupportable interpretation of the SBA-Landowner contract that the SBA not only subordinated its mortgage to the extent of $400,000, but that it in some unexplained fashion obligated itself to pay off the Bank's mortgage in full. Of course no such obligation has been stipulated by the parties or implied by law. The second erroneous assumption is that the priority accorded by federal law to the SBA mortgage over the mechanic's lien must be converted into a priority in favor of the bank over the mechanic's lien. There is no justification for giving the bank a windfall at the expense of the mechanic in disregard of the order of priorities set by state law as between the mechanic and the bank.
 
 The judgment of the District Court is
 
 22
 Affirmed.
 
 HAYNSWORTH, Chief Judge, (concurring):
 
 23
 I join the opinion of the Court, because of the relevant decisions of the Supreme Court treating the claims of mechanics lienors as inchoate and subordinate to a variety of secured claims of the United States, though, under state law, the mechanics lien would be entitled to priority. I must confess, however, considerable doubt about the legitimate viability of the Insolvency Statute as applied in such recent cases as Commonwealth of Kentucky, Department of Revenue v. United States, 6 Cir., 383 F.2d 13. Indeed, were it not for the decision of the Supreme Court in United States v. Vermont, 377 U.S. 351, 84 S.Ct. 1267, 12 L.Ed.2d 370, I should think we would be confronted in this case with a grave question of the survival of the Insolvency Statute after enactment of the Federal Tax Lien Act of 1966.[1]
 
 
 24
 It is most unfortunate that the Congress, when considering the Federal Tax Lien Act of 1966, did not focus its attention specifically upon the Insolvency Statute. Had it done so, I am confident the Insolvency Statute would have been repealed or substantially amended, for all of the time, attention and effort expended in drafting, considering and passing the Federal Tax Lien Act of 1966 will be fruitless, except in bankruptcy cases, if the Insolvency Statute is applied to preserve the super-priorities which the Federal Tax Lien Act of 1966 undertook to withdraw from tax claims. The question of priorities is wholly of largely academic, unless the debtor is insolvent, and the clearly stated purpose of the Federal Tax Lien Act of 1966 was to regulate the priority of federal tax claims when competing for payment out of the assets of an insolvent taxpayer with secured claims which would enjoy priority under state law.
 
 
 25
 The failure of Congress to deal specifically with the Insolvency Statute when amending the federal tax lien statute leaves a lurking question arising out of United States v. Vermont, supra, which suggests a definite independence between the two statutes and differences in their meaning and application. In Vermont, the opinion of the Supreme Court states that the takpayer was solvent, though from the opinion in the Court of Appeals,[2] it would appear that there was simply an absence of proof of insolvency, such proof being wholly unnecessary under the federal tax lien statute, but its decision suggests that, when the taxpayer is insolvent, the only probable occasion for litigation about the matter, the Insolvency Statute should be applied without regard to the unamended tax lien statute.
 
 
 26
 The subsequent enactment of the Federal Tax Lien Act of 1966 and its legislative history may lead the Supreme Court to a different conclusion in delaing with federal tax claims when the Government has elected to invoke the Insolvency Statute rather than the Tax Lien Act of 1966, but, in the present circumstances, in light of Vermont's rationale, I cannot say that the Federal Tax Lien Act of 1966 by implication repealed the Insolvency Statute entirely so as to be inapplicable to a contractual claim, or so modified it as to accommodate the priorities which would be recognized if the distribution were being effected by a court in bankruptcy.
 
 
 27
 Without specific congressional consideration of the Insolvency Statute or a fresh reconsideration of it by the Supreme Court, it remains an anachronism under which federal claims are accorded greater priority when the distribution of the assets of an insolvent debtor is being effected under state law than when it is being effected under the Bankruptcy Act, under which federal tax claims may be arguably entitled to priorities which the Federal Tax Lien Act of 1966 would deny them, and under which other government claims, deferred to tax claims in bankruptcy, may be entitled to greater priority under a state regulated distribution of the insolvent's assets.
 
 
 28
 In light of the course of decision in the Supreme Court, I do not think this Court in this case is free to consider a judicial development of rational answers. I mention the problems, for it seems to me that, particularly after enactment of the Federal Tax Lien Act of 1966, there is an urgent need for congressional attention to the Insolvency Statute, so that what, if anything, was intended to be left of it may be made manifest.
 
 ALBERT V. BRYAN, Circuit Judge, (dissenting):
 
 29
 In my judgment the proceeds of sale should be distributed in this manner:
 
 
 30
 First, pay SBA the money owing on its mortgage;
 
 
 31
 Second, from this money require SBA to reimburse the Bank its loan of $400,000; and
 
 
 32
 Third, to the mechanic's lien any moneys left after payment of SBA's loan.
 
 
 33
 The subordination stipulation in the Small Business Administration mortgage wholly distinguishes this case from the Government-priority-lien and the circuity-of-lien decisions on which the majority relies, e.g., United States v. City of New Britain, 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520 (1954). Although not so couched in terms, actually it is a covenant to pay the Bank's loan from SBA's recovery. The assurance is effectuated through the extension to the Bank of the benefit of SBA's overriding priority.
 
 
 34
 I. To start with, the majority errs in deciding the Bank's rights on the basis of the State law. The claim of the Bank rests entirely on Federal law. Priority as between the liens of the Bank and SBA is established solely by Federal criteria. W. T. Jones & Co. v. Foodco Realty, Inc., 318 F.2d 881 (4 Cir. 1963). The primacy claimed by the Bank is not founded on State law. It is supported to a point, as will more explicitly appear immediately, by the decision in United States v. State of Texas, 314 U.S. 480, 62 S.Ct. 350, 8 L.Ed. 356 (1941) but it is only fully established by SBA's mortgage stipulation. There can be no doubt that Federal law governs interpretation of the meaning and force of the stipulation.
 
 
 35
 II. The presence of the SBA mortgage following the Bank mortgage was not, as the majority would have it, simply a fortuitous circumstance. SBA's mortgage complemented the Bank's. The two loans had a single object, the provision of moneys for a project admittedly within the field of the Small Business Administration.
 
 
 36
 SBA policy in furnishing aid is to avoid interference with private financing. If it had placed the mortgage without having an understanding with the Bank, it might have pulled down the entire enterprise. This is true because the SBA mortgage might otherwise, as will soon appear, prevail over the Bank mortgage and thus destroy or dangerously impair its security. The Bank was not compelled to suffer a confiscation of this kind through an agreement of the owner and SBA alone. Such an act of the owner would certainly be an abrogation, or default, of and in the inherent condition of the mortgage that the security not be removed. Seemingly it would, also, be a breach of the owner's warranties in the Bank's mortgage.[1] The moment the SBA mortgage was recorded, the Bank's security was jeopardized. Thereupon the Bank would have the right to restrain its consummation or to foreclose unless this threat was abated. Obviously, SBA did not intend to bring about a collapse of the whole venture. No private mortgage would be obtainable on SBA-eligible projects if an owner and SBA, without the assent of the private lender, could completely dissolve the latter's security. The stipulation in the SBA mortgage was plainly inserted to bar that possibility.
 
 
 37
 The statute did not in terms give a private mortgage a place above a subsequent Government mortgage, and the decisional low was by no means clear in so preferring it. The nearest approach was United States v. State of Texas, supra, 314 U.S. 480, p. 484, 62 S.Ct. 350, p. 352 (1941) where the uncertainty appears in the words of the Court:
 
 
 38
 'Section 3466 (now 31 USC 191) mentions no exceptions to its requirement that 'the debts due to the United States shall be first satisfied.' It is nevertheless true that in several early decisions this Court read an exception into the section in the case of previously executed mortgages. Thelusson v. Smith, 2 Wheat, 396, 426, 4 L.Ed. 271; Conrad v. Atlantic Insurance Co., 1 Pet. 386, 7 L.Ed. 189; Brent v. Bank of Washington, 10 Pet. 596, 611, 612, 9 L.Ed. 547. This doctrine seems to have been based on the theory that mortgaged property passes to the mortgagee and is no longer a part of the estate of the mortgagor. See Conard v. Atlantic Insurance Co., supra, at 441-442, 7 L.Ed. 189. The question of whether the priority of the United States under 3466 would also be defeated by a specific and perfected lien upon property, whose title remained in the debtor was reserved in those cases. Ibid; Brent v. Bank of Washington, supra, 10 Pet. at 611-612. * * *'[2]
 
 
 39
 That the parties believed there was this doubt is conclusively evidenced by their adoption of the stipulation. In any event, they now rely upon it.
 
 
 40
 III. But the stipulation is more than an acknowledgment of lien precedence. To repeat, it really amounts to an agreement between the owner and SBA, for the benefit of both the owner and the Bank, that SBA will from its prime position pay the Bank its loan. Accomplishing a complementation between the two loans, it saved the owner from foreclosure and permitted him to borrow from the Government.
 
 
 41
 Under the stipulation SBA could not appropriate its lien-recovery to its own loan until it had paid the Bank. SBA, of course, intended to press its overtopping lien to the fullest against the mortgage res, and then see that the Bank received its share.
 
 
 42
 Concededly, SBA was sheltering the Bank under the coverage of the sovereign prerogative. This use of its supremacy in aid of a private lender, however, was entirely within the powers of SBA, unquestionable precedent holds.
 
 
 43
 While the two loans were not made simultaneously, and so the facts are not identical with those in Small Business Administration v. McClellan, 364 U.S. 446, 81 L.Ct. 191, 5 L.Ed.2d 200 (1960), still the principles there announced are apposite here. Declaring that SBA could lawfully extend its priority to protect private lenders, the Court spoke to the point as follows, p. 452, 81 S.Ct. p. 196:
 
 
 44
 'The Small Business Administration is authorized to enter into contracts calculated to induce private banks to make loans to small businesses. The contract involved in this case, by providing additional security to the private bank at the Government's expense, is well adapted to that end. Indeed, in many cases such a contract may be the only way the Administration could induce private bank participation in a necessary loan.'
 
 The Court continued:
 
 45
 'It is true that the allowance of the priority asserted here will place the bank, a private unsecured creditor, in a better position than other private unsecured creditors. But this position is a result * * * of the bank's valid contract with the Small Business Administration.' p. 452-453, 81 S.Ct. p. 196.
 
 
 46
 Presently SBA did in effect contract with the Bank in order to save the Bank mortgage from the squeeze of SBA's superior strength. Although not persuading the Bank to make the loan originally, the agreement of SBA did induce the Bank to continue its loan.
 
 
 47
 The status of the Bank's claim becomes even plainer upon a consideration of the posture of its mortgage after SBA has paid the Bank's loan. The mortgage is not thereby satisfied, but SBA is subrogated to its lien. However, as subrogee it would merely step into the place of the Bank. The mortgage then would be subject to the same defenses as could have been interposed against the Bank if it had remained as the mortgagee. That would be the time and place for the contractor to assert his present claim of priority.
 
 
 48
 The upshot is that the Bank is entitled to payment by virtue of the agreement with SBA, without reference to State law, and consequently the priority given by the West Virginia statute to a mechanic's lien has no immediate pertinency.
 
 
 49
 IV. SBA had an untrammelled right to distribute its recovery by payment of a part to the Bank, just as the Court said in McClellan, supra, 364 U.S. 446, 81 S.Ct. 191:
 
 
 50
 '* * * there is no difference between the money so received and money received from any other source and, like other money, it may be disbursed in any way the Government sees fit, including the satisfaction of obligations already incurred so long as the purpose is lawful.' p. 452, 81 S.Ct. p. 196.
 
 
 51
 The money would come to the Bank unencumbered by any obligation to anyone save the duty to wipe out the debt. Notwithstanding, the Court now subjects this money to the mechanic's lien because State law gives priority to a mechanic's lien over a private mortgage. The infirmity of this contention is that the Bank's receipt did not derive from the enforcement of its lien against the property, but came out of the SBA's priority. The Court's decision violates the policy and agreement of SBA in making its loan. The contractor accepted the benefits fits of the loan-- presumably it was applied to the cost of the construction-- and without the stipulation, he would not have received the SBA money.
 
 
 52
 No equitable considerations dictate capture of the Bank's recovery, as the Court now does, to save the contractor. He would not have recovered a penny had the Bank not participated in the case at all. The Bank has taken nothing from the contractor. Its claim is not satisfied out of moneys against which the contractor would otherwise be entitled. He is not displaced by any act of the Bank.
 
 
 53
 For its decision the Court reasons that the contractor's priority over the Bank under State law should not be disturbed, cf. United States v. City of New Britain, supra, 347 U.S. 81, 88, 74 S.Ct. 367, 98 L.Ed. 520 (1954), because the contractor would prevail here, if the Federal government were not involved. However appealing it may seem at a glance, this contention ignores the paramount fact that the Federal government is involved here, and that its presence is attended by the compelling demands of the Federal statute and the policy and needs of the SBA.
 
 
 54
 In looking for equities to support its conclusion, the Court also muses on what might have been done by the Bank to save itself. It is said that the Bank was the only party which could have protected itself. It cannot be denied that it could have obtained a waiver of the mechanic's lien before advancing the loan moneys. But this comes with poor grace from the contractor as ground for equitable relief; the exaction of a release would have put the pinch on the contractor.
 
 
 55
 If reveries are to create equities, it is only right to ponder also what the contractor might have done. The contractor could have sought lien subordination from SBA as did the Bank. Had it been refused, the contractor could have treated the procurement of the SBA loan as a breach of the contract by the owner, i.e. impairment of the priority of the contractor's statutory lien. Also, speaking of possibilities open to the litigants, the contractor could have demanded payments from the owner, at close intervals, to keep the payments current with the labor, materials and profit invested in the job.
 
 
 56
 Thus the equities in the case are as much with the Bank as with the contractor.
 
 
 57
 V. The schedule of application of the moneys I suggest is both legally and equitably sound. It accords the Federal claim its complete statutory priority and it enforces the agreement made by SBA for the benefit of the owner and the Bank, all in conformity with the policy of SBA. The mechanic's lien is snuffed out, true, but solely by the statutory priority of SBA and not by the Bank. This hardship has been decried by scholars, but the outcome is rightly blamed on the ancient act of Congress, now 31 U.S.C. 191, supra, fn. 1.[3]
 
 
 58
 I would reverse and distribute the moneys according to the formula first stated herein.
 
 
 
 [1]
 The property was sold prior to the hearing of this appeal for $700,000. The aggregate amount due the three principal lienors is approximately $1,600,000 as follows: The Small Business Administration $1,042,500.00, Huntington Trust & Savings Bank $400,000.00 and H. B. Agsten & Son, Inc. $217,098.33. Therefore, we ignore in this opinion a myriad of inferior liens also outstanding against the insolvent debtor
 
 
 [2]
 West Virginia Code (Michie ed. 1966) 38-2-1. Lien of Contractor
 'Every person, firm or corporation, which shall erect, build, construct, alter, remove or repair any building or other structure, or other improvement appurtenant to any such building or other structure, under and by virtue of contract with the owner for such erection, building, construction, alteration, removal or repair, either for an agreed lump sum or upon any other basis of settlement and payment, shall have a lien upon such building or other structure or improvement appurtenant thereto, and upon the interest of the owner thereof in the lot of land whereon the same stands, or to which it may have been removed, to secure the payment of such contract price or other compensation therefor.'
 38-2-17. Priority of Mechanics' Liens Over Other Liens.
 'All of the liens authorized and created by this article shall * * * have priority over any and all liens created by trust deed or otherwise, on such building or other structure and improvements appurtenant thereto and on the interest of the owner in the lot of ground whereon the same stands or to which the same may have been removed, subsequently to the time when such labor shall have begun to be performed, or such material or machinery or other necessary equipment shall have begun to be furnished.'
 
 
 [3]
 Kennedy, The Relative Priority of the Federal Government: The Pernicious Career of the Inchoate and General Lien, 63 Yale L.J. 905, 927 n. 128 (1954)
 
 
 [4]
 S.Rep. No. 1708, 89th Cong.2d Sess. (1966); H.Rep. No. 1884, 89th Cong.2d Sess. (1966), U.S.Code Cong. & Admin.News 1966, p. 3722
 
 
 [5]
 Professor Kennedy chronicles the amendments whereby purchasers, mortgagees and judgment creditors (37 Stat. 1016 (1913)) and pledgees (53 Stat. 882-883 (1939)) were accorded protection from unfiled federal tax liens. Kennedy, op. cit., at 921-2
 
 
 [1]
 Pub.L. 89-719, 80 Stat. 1125
 
 
 [2]
 2 Cir., 317 F.2d 446
 
 
 [1]
 The owner's warranties were as follows:
 'Grantor covenants that said real estate is free from all liens and incumbrances whatsoever, and that he will warrant generally said real estate.' (Accent added)
 
 
 [2]
 See also W. T. Jones & Co. v. Foodco Realty, Inc., supra, 318 F.2d 881, 886 (4th Cir. 1963), where this court expressed its doubt whether previously executed mortgages would now prevail over Federal priority asserted under the statute
 
 
 [3]
 See, e.g. Note, The Relative Priority of Small Business Administration Liens; An Unreasonable Extension of Federal Preference? 64 Mich.L.Rev. 1007 (1966); Kennedy, The Relative Priority of the Federal Government; The Pernicious Career of the Inchoate and General Lien, 63 Yale L.J. 905 (1954)