896 F.2d 1367
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
In re SPRINKLERS, CONTROLS, & ALARMS, INC., t/a SCA, Inc.,
t/a SCA, Debtor.
SPRINKLERS, CONTROLS, & ALARMS, INC., Plaintiff-Appellant,
v.
GRINNELL CORPORATION; Western International Fire Sprinkler
Corp.; Able Equipment Co., Defendants-Appellees,
and
Floyd Ellett; Frazier Construction Co.; Star Equipment
Corp.; Scott-Gallagher Inc.; Central Fidelity
Bank; Internal Revenue Service, Defendants.
 No. 89-2620.
 United States Court of Appeals, Fourth Circuit.
 Argued: Nov. 1, 1989.
Decided: Feb. 9, 1990.
 
 Norman Hunter Lamson, Sr., for appellant.
 John Seth Smart (Robert L. Thomlinson, on brief), for appellees.
 Before K.K. HALL and CHAPMAN, Circuit Judges, and HARRISON L. WINTER, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 This appeal evolved from the bankruptcy petition filed by Sprinklers, Alarms and Controls, Inc. Central Fidelity Bank ("CFB") appeals from the district court's order which affirmed the bankruptcy court's order granting priority to the appellees, three mechanics' lienholders, over CFB with regard to funds owed to the debtor and interpleaded into the bankruptcy court. Finding that the priority issue was properly decided, we affirm.
 
 I.
 
 2
 Sprinklers, Controls and Alarms, Inc. ("SCA" or "debtor") was in the business of installing automatic sprinkler systems on construction projects. In September 1986, CFB recorded a security instrument endorsed by SCA's principals to secure payment of $160,000 in loans to SCA. This agreement assigned as collateral
 
 
 3
 [a]ll accounts, receivables, notes, drafts, acceptances, instruments, documents and chattel paper of every nature and type, together with all guarantees and securities therefor, and all monies and other proceeds (cash or noncash) now or hereafter to become due thereon, including but not limited to the right to payment for goods sold or leased or for services rendered whether or not it has been earned by performance, which Collateral is hereinafter collectively referred to as "Accounts"....
 
 
 4
 The security interests hereby granted are to secure payment to the Bank of all present and future indebtedness and liabilities of Debtor to Bank, now existing or hereafter incurred, whether matured or unmatured, direct or indirect, secured or unsecured, original....
 
 
 5
 Recordation was properly made under the UCC so as to give CFB a perfected security interest. Code of Virginia Sec. 8.9-102.
 
 
 6
 In October 1987, SCA contracted with Frazier Construction Company to act as a subcontractor to install a sprinkler system in the Mrs. Giles Country Kitchen construction project. The Frazier-SCA contract price was $42,500. As subcontractor on this project, SCA bought materials from Grinnell Corporation, rented equipment from Able Equipment Company, and subcontracted with Western International Fire Sprinkler Corporation for labor and materials.
 
 
 7
 Shortly before March 22, 1988, Frazier delivered a $23,876 check payable to SCA and Grinnell for services through that date.[1] On March 22, 1988, SCA filed for Chapter 11 bankruptcy. On April 8, 1988, SCA filed a "complaint to turnover property of the estate" which essentially asked the bankruptcy court's guidance on what to do with both the $23,876 check as well as the remainder of the contract price which SCA claimed would be due imminently. On April 15, Western contracted with Frazier and SCA to complete SCA's contract on the Mrs. Giles project.
 
 
 8
 By order entered May 2, 1988, the bankruptcy court ordered that the $23,876 check be returned to Frazier, that Frazier interplead $17,177.46 of such amount,[2] and that Frazier thereafter interplead all remaining amounts due to SCA under the Mrs. Giles subcontract. Upon completion of the Mrs. Giles project, Frazier interpleaded another $16,857.80, the remainder of the amount due to SCA under the Mrs. Giles subcontract.[3]
 
 
 9
 On May 9, 1988, SCA's bankruptcy was converted to a Chapter 7 proceeding. Among the claims filed were CFB ($160,000); Grinnell ($23,752.68); Western ($31,640); and Able ($5,983.58).[4] The court found that each claim was properly perfected. The court then determined that the mechanics' liens had priority over CFB's security interest vis-a-vis the interpleader fund and, in accordance with state law, awarded each of the mechanics' lienholders a pro rata share of the fund; CFB received nothing. SCA appealed to the district court and the bankruptcy court order was affirmed. SCA appeals.[5]
 
 II.
 
 10
 Because no federal agency claim is involved,[6] state law must be looked to for the ordering of priorities. H.B. Agsten and Sons, Inc. v. Huntington Trust and Savings Bank, 388 F.2d 156, 158 (4th Cir.1967). Code of Virginia Sec. 43-19 speaks clearly to the issue:
 
 
 11
 Validity and priority of lien not affected by assignments.--Every assignment or transfer by a general contractor, in whole or in part, of his contract with the owner or of any money or consideration coming to him under such contract, or by a sub-contractor of his contract with the general contractor, in whole or in part, of any money or consideration coming to him under his contract with the general contractor, and every writ of fieri facias, attachment or other process against the general contractor or sub-contractor to subject or encumber his interest arising under such contract, shall be subject to the liens given by this chapter to laborers, mechanics, and materialmen. No such assignment or transfer shall in any way affect the validity or the priority of satisfaction of liens given by this chapter.
 
 
 12
 The intent of this provision is unmistakable: laborers, mechanics, and materialmen cannot be deprived of their liens' priority through prior or subsequent assignments by their contractors. Thus, SCA's 1986 assignment to CFB of all money thereafter coming due "for services rendered" could not act to defeat the superior claims of the mechanics' lienholders. SCA's arguments to the contrary are without merit. Accordingly, the judgment is affirmed.
 
 
 13
 AFFIRMED.
 
 
 
 [1]
 This check represented payment for SCA's work on both the Mrs. Giles project and another Frazier-SCA contract, the "post office" project. Grinnell was included as a payee on the check by agreement of the three parties to the check
 
 
 [2]
 In the same order, the court approved an agreement by which Western purchased from SCA the post office subcontract. Because the $23,698.69 amount represented partial payments to SCA for contract services on both the Mrs. Giles and the post office subcontracts, the court ordered the post office portion ($6,698.69) to be paid to various post office sub-subcontractors on behalf of Western (as successor to SCA). The remainder, $17,177.46, represented the Mrs. Giles project portion of the payment
 
 
 [3]
 Although it is not entirely clear from the record before us, it appears that the interpleader fund, to the extent it was comprised of payments by Frazier under its subcontract with SCA on the Mrs. Giles project, amounted to $34,035.26 [$17,777.46 + $16,857.80]
 
 
 [4]
 Although served with SCA's complaint, SCA's other subcontractors on the Mrs. Giles project failed to answer or otherwise appear
 
 
 [5]
 The motivating force behind the appeal is likely SCA's principals who endorsed the $160,000 loan agreement and who are presumably liable on the note despite the corporation's bankruptcy. If CFB were given priority, their collective liability would be reduced accordingly. During argument in the bankruptcy court, counsel for CFB stated that SCA was "going to represent the bank's position."
 
 
 [6]
 The IRS had initially filed a notice of a tax lien during the pendency of the adversary proceeding but later disclaimed any interest in the disputed interpleader fund