# LEON B. BACK, Receiver *v.* INTERNAL REVENUE SERVICE

[No. 1051, September Term, 1981.]

*Decided June 2, 1982.*

The cause was argued before LISS and BISHOP, JJ., and DAVID WILLIAM SIMPSON, Associate Judge of the District Court of Maryland for District 2, specially assigned.

*Charles M. Tatelbaum,* with whom were *James A. Vidmar, Jr.,* and *Sherbow, Shea & Tatelbaum, P.A.* on the brief, for appellant.

*Joan I. Oppenheimer,* with whom were *Glenn L. Archer, Jr., Assistant Attorney General, Michael L. Paup* and *William S. Estabrook* on the brief, for appellee.

LISS, J., delivered the opinion of the Court.

This is an appeal by Leon B. Back, appellant, as receiver for J. B. Broadcasting of Baltimore, Ltd., (hereinafter J.B.), an annulled corporation, which before and after the annulment of its charter operated radio station WEBB in Baltimore, Maryland. The appeal is from the disposition by the Circuit Court of Baltimore City of the receiver's objec-

tions to the claims for withholding and unemployment taxes by the Internal Revenue Service.

The case originated on March 17, 1978, when Leon Back and others, all judgment creditors of J.B., filed a bill of complaint in the Circuit Court of Baltimore City in which they sought the appointment of a receiver for the assets of J.B., on the basis that J.B. was unable to pay its debts as they matured in the ordinary course of business. See Maryland Code (1975), Corporations and Associations Article, § 3-413. J. B. Broadcasting of Baltimore, Ltd. had its corporate charter annulled in the State of Maryland on January 21, 1976. Counsel for J.B. and its officers and directors vigorously contested the claim of the complainants and it was not until July of 1978 that J.B. (by James Brown, who had served as president of J.B. and was the owner of the overwhelming majority of the stock), filed a consent to the entry of summary judgment and the appointment of a receiver. On July 21, 1978, the court appointed Leon Back as receiver; however, because the necessary approval of the Federal Communications Commissioner was delayed, the receiver did not take control of the assets of J.B. until August 1, 1978. It is conceded by all parties that J.B.'s property at the time it was taken over by the receiver was in "deplorable condition." The receiver, who had extensive experience in the radio field and is an expert in the construction, licensing, operation and management of radio stations, marshalled the tangible assets of the station and subsequently was able to find a qualified purchaser (Brunson Broadcasting Corp. of Baltimore), who offered $430,000 for the station's assets. The sale was ratified by the F.C.C. on November 20, 1979. In the interim, the receiver continued to operate the station. It is agreed by all parties that the receiver performed excellently in preserving and selling the assets of J.B.

Numerous claims were filed in the receivership. Exclusive of the claims of the Internal Revenue Service, the total claims of creditors exceeded $850,000. Included in these claims were those of judgment creditors amounting to more than $650,000. The Internal Revenue Service filed claims for

withholding and unemployment taxes covering the entire period of J.B.'s existence. These claims were divided into three distinct periods. For Period One, which ran from 1970 through 1974, during which J.B. filed quarterly withholding returns, the I.R.S. claimed taxes due of $160,540, including interest and penalties. For Period Two, which ran from 1975 through part of 1978, during which J.B. and its successors filed no returns, IRS claimed taxes due of $268,586.90, including interest and penalties. For Period Three, which included the remainder of 1978 through the end of the receiver's tenure in November, 1979, the IRS filed a number of claims which in the aggregate, including interest and penalties, amounted to $61,557.41. The IRS claimed lien and priority status for its claims and the total claims of the IRS would have exhausted the entire trust estate to the exclusion of all other creditors.

The receiver filed objection to all of the claims of IRS. An evidentiary hearing was held in the Circuit Court of Baltimore City, at which time the amounts of the Internal Revenue's claims for Periods Two and Three were called into question. At the conclusion of the evidentiary hearing the court indicated that supplemental memoranda should be filed by April 22, 1981 and a further hearing was scheduled for the following day. In an attachment to its additional memorandum the IRS recomputed its figures for Periods Two and Three. Period Two liability was restated to be $113,856.39 (of which $81,876.60 constituted taxes and the remainder interest and penalties); the claims for the second quarter of 1978 were included in Period Two, removing them from Period Three. Oral argument was heard and the trial judge filed a memorandum opinion and order which accepted the IRS restated amount of claim for Period Two, overruled the receiver's objections to the several claims of IRS and allowed the claim of the IRS in the total amount of $320,032.07. Two days later the court *sua sponte* filed a revised memorandum opinion and order in which it struck its previous order and entered a new order disallowing interest and penalties for Period Three and reduced the allowed claim of the Internal Revenue to $308,143.57.

The receiver has called this Court's attention to an apparent mathematical error in which an additional $1,000 was erroneously added to the Internal Revenue Service's restated amount for Period Two. The appeal in this case is from the judgment of the trial court allowing the IRS claims in the total amount of $308,143.57. The appellant raises the following nine issues to be decided by this appeal:

    I. Does the Federal Tax Lien Act or section 3466 of the revised statutes permit payment of federal tax claims before the claims of preexisting judgment lien creditors in accordance with Maryland Law?

    II. Did the Internal Revenue Service adequately establish the prerequisites for the applicability of lien or priority status in this case?

    III. Was the receiver's status under Maryland law superior to the Internal Revenue Service's priority and lien status, even if they were established?

    IV. Could the Internal Revenue Service revive any lien status it possessed by purporting to revoke its release of liens during the pendency of the receivership while the trust estate was *in custodia legis*?

    V. Should the Internal Revenue Service have been allowed to collect taxes in this receivership proceeding because it failed to prove timely assessment or collection?

    VI. Did the lower court err in its determination of taxes due on the basis of speculation?

    VII. Did the lower court err in refusing to find that taxes that become due after a corporation ceases to exist are not collectable from the corporation in a receivership proceeding?

    VIII. Should the penalties claimed for Period Two have been disallowed because there was no proof of lack of good cause to excuse them?

IX. Should the lower court, in allowing the claim of the Internal Revenue Service for unemployment taxes, have granted a credit for amounts payable to the Unemployment Fund of the Maryland Department of Human Resources?

## I. and II.

The most important question to be decided in this case is the interplay between federal and state laws in determining the order of payment of claims against insolvent debtors in receivership. Simply stated, the inquiry is whether federal statutes and regulations establishing priorities in insolvency proceedings and providing for government liens for taxes impair the rights of judgment creditors under Maryland law. The Internal Revenue Code, (26 U.S.C.), section 6321 provides:

If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.

Section 6323 (a) provides for the circumstances under which the lien imposed by section 6321 becomes effective. It states:

(a) The lien imposed by section 6321 shall not be valid as against any purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor until notice thereof which meets the requirements of subsection (f) has been filed by the Secretary or his delegate.

In Maryland, a judgment lien is created by Maryland Code (1975, 1980 Repl. Vol.), Courts and Judicial Proceedings

Article, § 11-402, and by Maryland Rule 620. The statute provides in subsection 11-402 (b) as follows:

> (b) *Judgment of court of original entry.* — If indexed and recorded as prescribed by the Maryland Rules or the Maryland District Rules, a judgment of a court constitutes a lien to the amount and from the date of the judgment on the judgment debtor's interest in land located in the county in which the judgment was rendered except a lease from year to year or for a term of not more than five years and not renewable.

Section 11-403 states that a writ of execution does not become a lien on personal property until an actual levy is made. Maryland Rule 620 a provides as follows:

> A judgment shall constitute a lien to the amount and from the date thereof upon all real estate of the judgment debtor lying in the county wherein the judgment was entered, and upon all leasehold interest and terms for years of the judgment debtor in land, except leases from year to year and leases for terms of not more than five years and not renewable.

The receiver urges that some of the judgment creditors should be afforded priority under 26 U.S.C. § 6323 (a), *supra,* which provides that a federal tax lien has no priority over a judgment lien until notice of the claim has been filed. It is conceded that some of the judgments were recorded first in time; nevertheless, the case law seems to establish that in order to be entitled to priority under § 6323 (a), the judgment lien must be "choate and specific" prior to the filing of the federal lien. To meet this test the judgment lien must be *definite* in three respects: (1) the identity of the lienor, (2) the property subject to the lien; and (3) the amount of the lien. *See United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S. Ct. 1448, 59 L. Ed. 2d 711 (1979).

In the case at bar, no evidence was offered by the receiver to establish whether any of the judgment liens would meet the "choate and specific" test.

The appellee contends that it not only has a lien against the appellant's property under section 6321 as we have heretofore stated it, but also under the provisions of the Revised Statutes § 3466 (31 U.S.C., § 191). That section provides in pertinent part as follows:

> Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied; and the priority established shall extend as well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed. The priority established under this section does not apply, however, in a case under Title 11.

Appellee urges that by its broad terms the statute admits of no exceptions in conferring absolute priority for debts due the United States from an *insolvent* person or estate. *United States v. Vermont,* 377 U.S. 351, 84 S.Ct. 1267, 12 L.Ed.2d 370 (1964). It is not contested that when the receiver in this case was appointed by the Circuit Court of Baltimore City on July 21, 1978, substantial sums were due the United States on account of unemployment and withholding taxes.

Appellant points out that there is an apparent conflict between the Federal Tax Lien Act, IRC 6321-6323 and the statute affording federal claims priority in insolvency under section 3466 of the Revised Statutes and contends that in the light of the conflict, pre-existing judgment liens should be paid before federal tax claims.

The IRS urges that this Court adopt the reasoning found in the treatise on Federal Tax Liens by William T. Plumb, Jr. (3d ed. 1972), in which the author stated at page 192, "On its face, the Government's priority in distribution, which applies to federal tax claims [footnote omitted] whether or not secured by an antecedent lien, is *absolute and admits of no exceptions.*[5]" [Emphasis added]. Footnote 5 refers to *United States v. Waddill, Holland and Flinn,* 323 U.S. 353, 65 S.Ct. 304, 89 L.Ed. 294 (1945), and *United States v. Vermont, supra,* as support for the quoted statement.

In the 1981 supplement, however, Plumb has modified the language of the above quote and changes the footnote:

P. 192 (text): Change 5th line from top to read: an antecedent lien, *has been said to be absolute, admitting of no exception.*[5] [Emphasis added].

P. 192, n. 5. *Change* note 5 to read:

> The Supreme Court statements are all dicta; the strongest is most recent. United States v. Vermont, 371 U.S. 351, 358 (1964). But the issue was not fully briefed in *Vermont* or any of the other cases repeating the dicta. Reliance has been placed mainly on United States v. Gilbert Associates, 343 U.S. 361 (1953), which, in turn, relied upon Thelusson v. Smith, 15 U.S. (2 Wheat.) 396 (1817). Conrad v. Atlantic Ins. Co., 26 U.S. (1 Pet.) 386 (1828), which fully disposes of Thelusson, while fitfully cited, has been truly neglected. It upheld a lien for a loan to an importer on outbound and future inbound cargo over the priority and refused to read section 3466 literally, holding, on the contrary, that it is p. 438 "a mere right of prior payment, out of the general funds of the debtor in the hands of the assignee." Brent v. Bank of Washington, 37 U.S. (10 Pet.) 569 (1836), held a bank lien upon its shares for any debt of the shareholder to the bank was not defeated by section 3466. It would thus appear that section 3466 does not impose a stricter test of

perfection of a competing lien than the later
enacted federal tax lien. In the rest of the text of
this chapter, we have not attempted to qualify the
dicta, though the issue is worth presenting for
decision.

In *United States v. Vermont, supra,* at 357-59, the
Supreme Court said:

Section 3466 on its face permits no exception
whatsoever from the statutory command that
"[w]henever any person indebted to the United
States is insolvent ... debts due to the United
States shall be first satisfied." The statute applies
to all the insolvent's debts to the Government,
whether or not arising from taxes, and whether or
not secured by a lien. In *United States v. Gilbert
Associates,* 345 U.S. 361, without questioning that
the lienor was identified, the amount of the lien
certain or the property subject to the lien definite,
this Court accorded priority to subsequently arising
claims of the United States against an insolvent
debtor on the ground that:

"In claims of this type, 'specificity' requires
that the lien be attached to certain property by
reducing it to possession, on the theory that the
United States has no claim against property no
longer in the possession of the debtor. . . . The
taxpayer had not been divested by the Town of
either title or possession. The Town, therefore,
had only a general, unperfected lien." *Id.,* at
366. [Footnote omitted].

The state tax commissioner's assessment and
demand in the present case clearly did not meet
that standard, nor, so far as that goes, did the writ
of attachment served 'on the Chittenden Trust
Company.[8] But the *New Britain* case, 347 U.S. 81,

---

8. Indeed, this Court has repeatedly reserved the question whether the
priority given the United States by R.S. § 3466 can be overcome even by a

in which "[t]he taxpayer had not been divested by the Town of either title or possession," makes quite clear that different standards apply where the United States' claim is based on a tax lien arising under §§ 6321 and 6322.[9] "When the debtor is insolvent, Congress has expressly given priority to the payment of indebtedness owing to the United States, whether secured by liens or otherwise, by § 3466 of the Revised Statutes, 31 U.S.C. . . . § 191. In that circumstance, where all the property of the debtor is involved, Congress has protected the federal revenues by imposing an absolute priority [citing *United States v. Gilbert Associates,* 345 U.S. 361; *United States v. Waddill, Holland & Flinn,* 323 U.S. 353]. Where the debtor is not insolvent, Congress had failed to expressly provide for federal priority . . . although the United States is free to pursue the whole of the debtor's property wherever situated." *United States v. New Britain,* 347 U.S. 81, 85.

It is undisputed that the State's lien here meets the test laid down in *New Britain* that "the identity of the lienor, the property subject to the lien, and the amount of the lien are established." 347 U.S., at 84. Moreover, unlike those cases in which the *Security Trust* rationale was applied to subordinate liens on the ground that judgment had not been obtained prior to the time the federal lien arose, [Footnote omitted], it is as true of Vermont's lien here [Footnote omitted] as it was of the federal lien in *New Britain* that "The assessment is given the force of a judgment, and if the amount assessed is not paid when due, administrative officials may seize the debtor's property to satisfy the debt." *Bull*

---

prior specific and perfected lien. *United States v. Gilbert Associates,* 345 U.S. 361, 365; *Illinois v. Campbell,* 329 U.S. 362, 370; *United States v. Waddill Co.,* 323 U.S. 353, 355-356; *United States v. Texas,* 314 U.S. 480, 484-486; New York v. Maclay, 288 U.S. 290, 294; *Spokane County v. United States,* 279 U.S. 80, 95.

**9.** See also *Crest Finance Co. v. United States,* 368 U.S. 347.

*v. United States,* 295 U.S. 247, 260. [Footnote omitted].

For these reasons, we hold that this antecedent state lien arising under a statute modeled after §§ 6321 and 6322 is sufficiently choate to obtain priority over the later federal lien arising under those provisions.

Appellant in his brief has called our attention to a number of State decisions as well as cases decided in several of the Circuit Courts of Appeals which have held to the contrary. We particularly note *United States v. State,* 227 S.C. 187, 87 S.E.2d 577 (1955); and *Muniz v. United States,* 129 Ind. App. 433, 155 N.E.2d 140 (1958), both decided before *United States v. Vermont, supra,* where it was held that section 3466 did not give the United States government absolute preference over antecedent recorded judgments.

Appellant argues that the weight of the State decisions as well as the decisions of the federal courts has in many instances ruled against the government's asserted absolute priority. We note, however, that Revised Statutes § 3466 is a priority statute while IRC §§ 6321-6323 is a lien statute. It seems clear to us that section 3466, enacted as it was, almost at the very beginning of the Republic, was intended to protect the federal tax revenues by imposing an absolute priority. Congress undoubtedly has been aware of the clear language by which it established a statutory mandate which, on its face, permits no exception and although it has adopted new lien statutes from time to time, it has chosen not to change the priority section. The Supreme Court has had before it on several occasions the question of whether the priority granted under section 3466 may not be overcome by a fully perfected and specific lien, *e.g.,* in *Illinois v. Campbell,* 329 U.S. 362, 67 S.Ct. 340, 91 L.Ed. 348 (1946), but declined a direct determination as to whether section 6323 provides an exception to section 3466. *See United States v. Gilbert Associates, Inc.,* 345 U.S. 361, 73 S.Ct. 701, 97 L.Ed. 1071 (1953). *See also Commonwealth of Kentucky Dept. of Revenue v. United States of America,* 383 F.2d 13 (6th Cir. 1967).

In light of the strong dicta quoted from *United States v. Vermont, supra,* and in the absence of any proof by the receiver that the judgment creditor had taken any steps necessary to divest the debtor of either title or possession of the property owned by the insolvent before the insolvency proceeding began, we conclude that the recorded judgments in this case did not create such liens as would entitle the holder to priority over the claims of IRS. Under Maryland law, a judgment lien is a general lien on real property of the debtor and signifies only the right of the judgment creditor to order the sale of the debtor's property to satisfy his judgment. *See Messinger v. Eckenrode,* 162 Md. 63, 158 A. 357 (1932). To obtain priority over the government's claim for taxes the lien must be attached to *certain* property by reducing it to possession on the theory that the IRS has no claim against property no longer in the possession of the debtor. *United States v. Gilbert Associates, Inc., supra.* There is no evidence that any of the judgment lienors took action either by way of execution or attachment to divest the debtor of his title or possession. We conclude that the IRS must be accorded priority under IRC § 6323 (a) and § 3466 of the Revised Statutes.

Appellant has combined several complaints in this issue in which he argues that the IRS did not adequately establish the prerequisites required for the applicability of either lien or priority status in this case. One of the series of contentions is that the record is lacking in proof that there was any demand for payment of taxes as required by IRC § 6321 for the lien holder status to arise and that the record further lacks any proof that a warrant was issued or a levy made under the receivership. Under these circumstances, appellant contends that the existence of any tax lien should have been viewed by the trial court as irrelevant. The short answer to this contention is that the issue was neither raised nor decided in the proceedings below and is therefore not preserved for appellate review. Maryland Rule 1085.

Appellant further urges that the trial court ignored the receiver's argument that the government had failed to prove the prerequisites for priority status under section 3466 of the

Revised Statutes. The receiver contends that the section applies only when: (a) a decedent's estate is insufficient to pay all the debts due by the deceased; or (b) a debtor not having sufficient property to pay all his debts makes a voluntary assignment for the benefit of creditors; or (c) an attachment of the estate of an absconding, concealed or absent debtor has occurred; or (d) there has been the commission of an act of bankruptcy. Appellant argues that IRS's contention that the debtor's inability to pay all his debts within the ordinary course of business was not sufficient to bring its priority status into being. Appellant cites in support of this position *United States v. Oklahoma,* 261 U.S. 253, 43 S.Ct. 295, 67 L.Ed. 638 (1923), wherein the Court stated:

> The claim of the United States to the asserted priority rests exclusively upon the statute . . . . It establishes priority which is limited to the particular state of things specified. The meaning of the word "insolvent," used in the act, and of the insolvency therein referred to, is limited by the language to cases where "a debtor not having sufficient property to pay all his debts shall make a voluntary assignment," etc. Mere inability of the debtor to pay all his debts in the ordinary course of business is not insolvency within the meaning of the act, but it must be manifested in one of the modes pointed out in the latter part of the statute, which defines or explains the meaning of insolvency referred to in the earlier part. [261 U.S. at 259-260].

Appellant suggests that the consent of James Brown to the appointment of a receiver in this case was not a sufficient act of bankruptcy to bring this controversy under the provisions of section 3466 because insolvency under section 3466 contemplates not the "[m]ere inability of the debtor to pay all his debts in ordinary course of business," *Id.* at 260, but rather that the debtor has greater liabilities than assets. We think the opinion of the Supreme Court in *Illinois v. Campbell, supra,* is dispositive of this contention. In dis-

cussing the fifth act of bankruptcy, which is the one which the government relied upon in that case as having brought section 3466 into operation, the Court stated:

[Bankruptcy] *consists of a person's having,*

"(5) while insolvent or unable to pay his debts as they mature, procured, permitted, or suffered voluntarily or involuntarily the appointment of a receiver or trustee to take charge of his property . . . ." [Footnote omitted]. [Citation omitted]. [*Id.* at 368].

The court concluded that the receivership in that case, as in the one at bar, was a general one as contrasted with a receivership incidental to the enforcement of a lien. The Court held that the realities require us to treat the proceeding as a general equity receivership within the scope of section 3466. In the case at bar, no matter what standard we apply it is clear that the debtor was insolvent within the meaning of section 3466 and the ultimate consent to the appointment of a general receiver was more than sufficient to trigger the applicability of that section.

## III.

The receiver asseverates that his status under Maryland law was superior to the IRS's priority and lien status. As authority for this contention, appellant cites Maryland Code (1975) § 15-101 (d) of the Commercial Law Article, and argues that the appointment of the receiver created a status for him of a perfected, secured lien creditor on the date the proceedings were filed. Under appellant's theory, the trial court should have held that the receiver's qualification defeated any subsequent lien or priority status of the IRS. We do not agree. The Supreme Court, in *Aquilino v. United States,* 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960), ruled that "in the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property . . . sought to be reached by the statute. [Footnote omitted]. . . . [O]nce the tax

lien has attached to the taxpayer's state-created interests, we enter the province of federal law, which we have consistently held determines the priority of competing liens asserted against the taxpayer's 'property' or 'rights to property.' " [Citations omitted]. [*Id.* at 513-514].

Similarly, the state laws are equally inapplicable to cases involving section 3466 because the Supreme Court held that state laws cannot destroy the federal priority. *Illinois v. Campbell, supra; United States v. Oklahoma, supra; United States v. Texas,* 314 U.S. 480, 62 S.Ct. 350, 86 L.Ed. 356 (1941).

## IV.

Appellant contends that the record discloses that the IRS released and discharged a number of its filed tax liens applicable to Period One. The record extract substantiates this contention. Thereafter, in April and May of 1980, and during the pendency of the receivership proceeding while the trust estate was *in custodia legis,* the IRS filed notice of its revocation of its previous release of liens. The receiver argues that these revocations were ineffective and that once the receiver was appointed it would be improper to allow a creditor to improve its position *vis a vis* other creditors. The receiver points out that under the Md. Commercial Law Article, § 15-101 (c) (3), he is explicitly authorized to set aside any lien obtained within four months of the commencement of the receivership. He therefore contends that the liens sought to be revived by the revocation of a prior release or discharge within four months beginning March 17, 1978, or afterwards, should not be recognized.

Appellant has ignored the effect of the IRC (26 U.S.C.) § 6325 (f) (2), which provides in pertinent part as follows:

> (2) Revocation of certificate of release or nonattachment. — If the Secretary or his delegate determines that a certificate of release or nonattachment of a lien imposed by section 6321 was issued erroneously or improvidently, or if a cer-

tificate of release of such lien was issued pursuant to a collateral agreement entered into in connection with a compromise under section 7122 which has been breached, and if the period of limitation on collection after assessment has not expired, the Secretary or his delegate may revoke such certificate and reinstate the lien —

(A) By mailing notice of such revocation to the person against whom the tax was assessed at his last known address, and

(B) by filing notice of such revocation in the same office in which the notice of lien to which it relates was filed (if such notice of lien had been filed).

Such reinstated lien (i) shall be effective on the date notice of revocation is mailed to the taxpayer in accordance with the provisions of subparagraph (A), but not earlier than the date on which any required filing of notice of revocation is filed in accordance with the provisions of subparagraph (B), and (ii) shall have the same force and effect (as of such date), until the expiration of the period of limitation on collection after assessment, as a lien imposed by section 6321 (relating to lien for taxes).

While the IRS may not proceed by way of distress or execution against property held *in custodia legis,* it may, as it did in this case, file its claim for payment in the appropriate tribunal. *Thompson v. Henderson,* 155 Md. 665, 142 A. 525 (1928). We therefore find no merit to this contention.

V.

Appellant next contends that at least as to a portion of its claim IRS was not entitled to payment because it failed to prove timely assessment or collection. Under the IRC § 6501, assessment is required within three years after each quarterly return is filed and upon failure to assess within

this time period no proceeding for collection is permitted. Where assessment is timely, collection of the tax by levy or commencing a proceeding in court must occur within six years of assessment, IRC § 6502, and the only suspension of the six year period applicable in this case is for assets in the custody or control of a court, IRC § 6503 b, which occurred on August 1, 1978. From the record extract it seems clear that as to Period One, the lien of the IRS for all of the year 1970 and the first two quarters of 1971 did not arise until July 1, 1977. There is nothing in the record to establish that assessment was timely made and it seems to us that the burden is on IRS to establish the timeliness of the assessment.

The trial judge assumed that assessment had been timely and that the collection period had been suspended for approximately a one-and-one-half-year period while James Brown's assets allegedly were in the custody of a United States court. The judge in his memorandum opinion found that the debtor had filed for bankruptcy on May 25, 1971 and that the case was dismissed on August 28, 1972. On the basis of these factual findings the trial court concluded the statute of limitations for collection after assessment was suspended from May 25, 1971, through February 27, 1973. We have carefully examined the record extract and find no evidentiary support for these conclusions. At argument it was explained to us that the May 25, 1971 court proceeding was an involuntary petition for bankruptcy filed by creditors of James Brown. This petition was resisted and we were advised that no bankruptcy order has ever been entered by the District Court for Maryland at any time prior to the dismissal of the proceedings. If these representations are correct, it may appear that the mere filing of the involuntary bankruptcy proceeding may not toll the statute of limitations under section 6503 (b) for the calendar quarter of 1970 and the first two calendar quarters of 1971. There are further factual and legal findings to be made by the trial court as to the $54,920.89 tax liability alleged to be due the IRS for the 1970-1971 quarters. We shall remand to the trial court for further proceedings.

## VI.

After 1974, J.B. filed no Employer Quarterly Federal Withholding Tax Returns or Employer's Annual Federal Unemployment Tax Returns. It became apparent during the course of hearings in this matter that the IRS arrived at its computation of 1975 quarterly tax liability by doubling the 1974 information return and adding 15% for each quarter thereafter. When these calculations were resisted by the receiver and an expert witness produced by him, the IRS filed memorandum computations which resulted in reducing the claim for the taxes, penalties and interest from the original $268,568.90 to approximately $115,000. The receiver's expert originally indicated that computing the latter figure as proposed by IRS "would have been reasonable" but indicated in response to a clarifying question that this was "just speculation."

The trial judge, in his memorandum opinion, recited the circumstances under which the tax liability for Period Two was recomputed:

> At the hearing, all parties agreed that the original estimates were inflated. At this court's suggestion, the IRS recomputed the tax liability for Period Two based on the average of the wage statements from the last return filed during Period One and the first return filed during Period Three. The average quarterly wage figure was multiplied by the applicable federal unemployment tax rate in effect for 1975 through 1978. Consideration was given to testimony presented in court that no wages were paid certain employees for the twelve weeks prior to the receiver's assumption of control of the business. Interest and penalties were assessed. This appears to be the fairest method for computing the taxes due for this period.

In the light of the fact that James Brown failed to file the tax returns required by law and the receiver had no books and records from which an accurate assessment could have

been determined, we find no error in the trial judge's approval of the amended submission of tax due.

## VII.

Appellant argues that taxing authorities may not collect taxes incurred by a corporation after its charter is annulled and that J.B., Inc. was not liable for FICA and FUTA taxes with respect to the corporation's operations in Period Two between January 26, 1978, the date when the corporation's charter was annulled, and August 1, 1978, when the receiver took over the corporation's business operations. The mere fact that income is earned by a corporate entity after its charter has expired does not prevent such income from being taxed to that entity. See Messer v. Commissioner of Internal Revenue, 438 F.2d 774 (3d Cir. 1971). The fact that a corporate charter is annulled is of limited significance, since all employers are liable for FICA and FUTA taxes. While it is correct that the surviving directors and officers may be personally liable for the payment of these taxes, the mere annulment of the corporate charter does not immunize the corporation's assets from responsibility for taxes due and owing. See IRC §§ 3111, 3301, 3306 (a) (1).

## VIII.

Appellant complains that the trial court erred when it awarded the sum of $24,849.70 as penalties due on the restated amount calculated by the IRS as being due for Period Two. The receiver urges that even if the recalculation is accepted as being correct, no penalties should be allowed. He contends that where the IRS first asserts a penalty in a court proceeding, the penalty must be denied absent proof by the IRS of the taxpayer's lack of reasonable cause to excuse the failure to file and pay the taxes due. Both the appellant and appellee cite Riddell v. Commissioner, T.C. Memo 1956-74, 15 T.C.M. (C.C.H.) 379 (1956), as authority for their respective positions. Appellee contends that it was the obligation of the taxpayer to file the various returns under sec-

tion 6651 and section 6656 of the IRC and pay the taxes due. An examination of the record extract in this case discloses that neither the corporation nor the receiver filed the necessary returns for a number of quarters, nor were taxes due paid for several years. These facts in and of themselves are sufficient to raise the issue as to lack of reasonable cause and require the taxpayer or the receiver to offer some evidence to support the existence of reasonable cause to excuse the failure to file and/or to pay. No such proof was proffered. Under these circumstances, we find no error in the allowance of the penalties.

## IX.

Finally, appellant raises the question of whether the IRS claim for unemployment taxes should have granted a credit for amounts payable to the Unemployment Fund of the Maryland Department of Human Resources as contemplated by IRC § 3302. In this instance, both the IRS and the Maryland agency have filed claims for unemployment taxes. All the federal claims were based on the gross rate of the federal tax rather than the effective net rate. When the receiver discovered this fact he requested the chancellor by letter to prevent an inadvertent disallowance of the state's claim or a possible federal double recovery by ordering that any allowance to the IRS be computed on the net amount of federal unemployment taxes with penalties and interest. The receiver urges that IRC § 3302 (a) (3) explicitly allows a state credit of 90% even where the federal unemployment contributions have not been timely paid. The chancellor failed to so order. We hold this was error. Where, as in this case, it appears that the IRS will receive from the estate all the taxes, interest and penalties due it, we see no reason why the computation should not be predicated on the net amount due the federal government rather than the gross amount due under section 3302 of the IRC. We see no useful purpose in requiring the Maryland Department of Human Resources to file a refund petition which may well extend the ultimate conclusion of this matter for many more years.

As evidenced by this opinion, we shall affirm the chancellor in his conclusions except that we shall remand the case for an adjustment of the mathematical error of $1,000. In addition, the chancellor shall take whatever additional testimony is necessary to resolve the issue of the application of limitations in the claim in Part Two, and shall make the necessary adjustment in the amount of the IRS claim under section 3302 (a) (2) and (3). The IRS has been allowed substantial sums for interest and penalties and in fairness to other creditors we conclude that the costs of this complicated proceeding should be shared by the appellant and appellee.

*Judgment affirmed in part, remanded for further proceedings as to the adjustments herein ordered; costs to be divided between the parties.*